582 So.2d 269 (1991)
STATE of Louisiana, in the Interest of J, K AND T.
No. CJ 90 0371.
Court of Appeal of Louisiana, First Circuit.
May 16, 1991.
Stay Order Denied; Writ Denied June 21, 1991.
*270 Janice L. Kazmier, Bureau of Gen. Counsel, New Orleans, for appellee.
James H. Looney, Asst. Public Defender, Covington, for appellant, mother K.P.
Before COVINGTON, C.J., LANIER, SHORTESS and WATKINS JJ., and VIAL LEMMON[*], J. Pro Tem.
MARY ANN VIAL LEMMON, Judge Pro Tem.
KP appeals from a judgment terminating her parental rights to three of her children.[1]
The father of the children, T.P., has voluntarily relinquished his parental rights. The issue on appeal is whether the court committed manifest error in its determination that termination of K.P.'s parental rights is appropriate under R.S. 13:1601 because it was shown by clear and convincing evidence that she has "shown no significant substantial indication of reformation and is unlikely to reform."
The children who are the subject of this suit came into State's custody in October, 1986 by emergency order issued at the request of the mother. She was pregnant with her fourth child and felt unable to care for the children. She planned to move into a maternity home to await the birth of her child. The State worked diligently with her toward the goal of reuniting her with her children until November, 1989 when it filed a Petition to Terminate Parental Rights. All three children have been in foster care continuously since the State obtained custody, except for T., who was placed with his mother on a trial basis from October 31, 1988 to March 29, 1989. Each of the three sets of foster parents has indicated its intention to adopt its ward if termination is granted.
The testimony reveals that after the children were taken into custody the mother was unable to provide for her own well-being. She was involved in an unhealthy relationship with T.P., was unable to perform basic hygienic and nutritional tasks, moved numerous times, was unable to maintain steady employment, and did not successfully conform to the goals set by the State in order to achieve reunification. The brief trial reunification with T. was unsuccessful, and the State removed him simultaneously with its removal of another child not subject of the hearing.
As of the time of trial there were indications of some improvement in K.P.'s ability to provide for her own well-being. She had been steadily employed as a waitress for nine months. She had a prospect of receiving training for a managerial job with the same employer. She was attending data processing classes and had proved by testing to be drug free. She was not yet in an independent living arrangement, although she had severed the relationship with T.P.
This case presents the delicate issue of balancing of the interests of parents in a continuation of a family unit and the interests of the children to be freed for adoption into a stable loving home life.
Federal guidelines, set forth in the Adoption Assistance and Child Welfare Act of 1980 (P.L. 96-272), require that States make reasonable efforts at reunification of the parent and child.[2] Where there is no reasonable probability of reunification, the State must develop an alternative permanency plan. Included in that mandate is the termination of parental rights so that a *271 child may be freed for adoption. The intent of the Act was to combat the foster care limbo to which so many of the nation's abused and neglected children were being subjected. Shotton, Making Reasonable Efforts in Child Abuse and Neglect Cases: Ten Years Later, 26 Cal.W.L.Rev 223, 253 (1989-1990).
Though the guidelines for foster care and development of a permanency plan were meticulously complied with in this case,[3] the State is required to include safeguards of due process and establish the conditions of R.S. 13:1601 for termination of K.P.'s parental rights by clear and convincing evidence. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
In his report of July 10, 1989 Dr. Scuddy F. Fontenelle, Ph.D., made the following recommendation based on his June 16, 1989 evaluation. I suggest that KP be given six to eight months in an attempt to live independently and autonomously, pursue increased independence from TP. I recommend that she be given contact with her children at least two visits per month, preferably afternoon visits of three to four hour duration, at a convenient St. Tammany Parish location. I do not recommend overnight or extended visits with her children. If K is able to maintain improved social and living arrangement in her life during the next six to eight months I would recommend gradually increasing contact with her children and having social service staff work with K to gain skills in child rearing and parenting. If K demonstrates that she is unable to live independently and cannot separate herself from TP, it is imperative that the children be given opportunity to continually bond with foster parents and reduce contact with KP.
As of the hearing date of January 3, 1990 K.P. had made significant strides toward fulfilling the goals set by Dr. Fontenelle. Although all experts agreed that the best interests of the children mandate that they remain in the homes of their foster parents with whom they are psychologically bonded, that removal of the children under these circumstances would be psychologically harmful to each of the children, and that it is unlikely that K.P. will ever possess the maturity for maintaining an appropriate parent-child relationship, since she has made steps in the right direction toward achieving that goal, she *272 should be given the chance to continue her efforts. The State must follow the recommendations of Dr. Fontenelle to gradually increase contact with her children and have its social service staff work with K.P. to gain skills in child-rearing and parenting.
In the event she regresses in her attempts or fails to continue strides toward reunification, another action for termination may be brought so the best interests of the children in being freed for adoption may be protected under the new set of circumstances then in existence. Based on this record the trial court was manifestly erroneous in finding the State had established by clear and convincing evidence that K.P. has "shown no significant substantial indication of reformation and is unlikely to reform" as of the date of this hearing.
Accordingly, we reverse the trial court judgment of termination. The custody of the three minor children, T., K., and J. will remain in the State.
REVERSED.
LANIER, J., concurs and assigns reasons.
SHORTESS and WATKINS, JJ., concur for reasons assigned by LANIER, J.
COVINGTON, C.J., dissents.
LANIER, Judge, concurring.
We concur with the result of the lead opinion that the trial court was manifestly erroneous (clearly wrong) in finding the State established by clear and convincing evidence that K.P. had "shown no significant substantial indication of reformation and is unlikely to reform" and in terminating K.P.'s parental rights. However, we believe more detailed statements of the facts of record and the law on termination of parental rights are necessary to fully explain our views herein.

PROCEDURAL FACTS
The three minor children of K.P. and T.P. first came into the custody of the State with an emergency custody order issued October 9, 1986, by the 34th Judicial District Court for the Parish of St. Bernard. The children were later adjudged "in need of care and supervision" by the same court on December 18, 1986. The matter was transferred to the City Court of Slidell by an order signed November 6, 1987.
On November 18, 1987, a 12-month removal review hearing was conducted, and on December 1st, 1987, the City Court of Slidell signed a judgment continuing custody of the children in the State with a plan for reuniting them with their parents. A Federal Permanency Placement Hearing was held on May 18, 1988, and by judgment signed June 15, 1988, custody was maintained in the State with reunification as the goal. A dispositional review hearing was held on November 16, 1988, and judgments were signed on December 20, 1988 and January 10, 1989, continuing custody in the State with reunification as the goal. Another dispositional review hearing was held on May 17, 1989, and a judgment was signed on June 29, 1989, continuing custody in the State for the purpose of considering termination of parental rights and obtaining permanent placement. A Court Appointed Special Advocate (CASA) was appointed by an order dated May 25, 1989.
On November 3, 1989, the State filed a petition for termination of parental rights pursuant to La.R.S. 13:1600-13:1605, and more particularly, La.R.S. 13:1601(B), (D), and/or (F). Another CASA was appointed by an order dated November 25, 1989.[1] On December 6, 1989, T.P., the children's biological father,[2] voluntarily surrendered his parental rights to T, K and J. By order dated January 3, 1990, T.P. was dismissed as a party to these proceedings. Also, on *273 January 3, 1990, a trial was held, and the trial court terminated the parental rights of K.P. K.P. took this suspensive appeal.

LAW APPLICABLE TO TERMINATION OF PARENTAL RIGHTS
La.R.S. 13:1601 provides, in pertinent part, as follows:
The court on its own motion may order that the district attorney petition, or the district attorney in his discretion may petition, for the termination of parental rights of the parent or parents of an abused, neglected, or other child within a juvenile court's jurisdiction, when the grounds set forth in the petition meet all the conditions of Subsections A, B, C, D, E, or F, of this Section. The district attorney may appoint any attorney representing the Department of Social Services as a special assistant district attorney for the purpose of prosecuting any such case, regardless of the domicile of said special assistant.
. . . . .
B. (1) One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment, as defined in R.S. 13:1600(7), pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
(2) The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
. . . . .
D. (1) The child has been in the custody of a child welfare department or other person, pursuant to a judicial order, for a period of at least one year.
(2) The child was removed from the custody of the parents by judicial order due to the parent's abuse or neglect of the child.
(3) The parent is unfit to retain parental control and there is no reasonable expectation of reformation on the part of the parent or parents.
(4) The child is an abused or neglected child, the Department of Health and Human Resources has made every reasonable effort under the circumstances to reunite the child with his parents, and the department recommends that it would not be in the best interest of the child to be reunited with his parents.
. . . . .
F. (1) The child has been in the custody of the Department of Health and Human Resources for a period of at least one year pursuant to a court order.
(2) The child was removed from the custody of his parent because of the parent's mental illness, mental retardation, or substance abuse; and such condition was so profound that it rendered the parent incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm.
(3) The continued custody of the child was necessitated by the parent's failure or refusal to effect a suitable alternative placement of the child other than foster care.
(4) Every reasonable effort has been made under the circumstances to rehabilitate the parent and such efforts have failed.
(5) There is no reasonable expectation of the parent being rehabilitated.
(6) Expert testimony established that termination of parental rights and adoption are in the child's best interest.
(7) An attorney is appointed to represent the parent's interests, if the child was removed from the custody of the parent because of the parent's mental retardation. (Emphasis added)
La.R.S. 13:1600 provides, in pertinent part, as follows:
(1) "Abused child" is a child against whom has been inflicted physical or mental injury which causes severe deterioration to the child, including a child who has been abused sexually or a child who has been exploited or overworked to such *274 an extent that his health, moral, or emotional well-being is endangered.
(2) "Neglected child" is a child whose parent or parents, although financially able to do so, have consistently refused to provide reasonably necessary food, clothing, shelter, or medical service. No child who is being provided treatment in accordance with a recognized religious method of healing in lieu of medical treatment shall for that reason alone be considered to be neglected or abused.
. . . . .
(6) "Unfit" refers to a parent:
(a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration to the child, or who has sexually abused, exploited, or overworked a child to such an extent that his or her health, moral or emotional well-being is endangered; or
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services in accordance with the tenets of a well recognized religious method of healing with a reasonable proven record of success. Financial inability alone shall not constitute grounds for termination of parental rights; or
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
(7) "Child in need of care" means a child:
(a) Whose parent inflicts or allows the infliction of physical injury or sexual abuse upon the child which seriously endangers the physical, mental, or emotional health of the child.
(b) Whose physical, mental, or emotional condition is threatened or impaired as a result of the refusal or neglect of his parent to supply the child with necessary food, clothing, shelter, or medical care, or as a result of the parent's neglect or imposition of cruel punishment.
(c) Who is without necessary food, clothing, shelter, or medical care because of abandonment by, or the disappearance of, his parent.
(d) Who has been placed in the custody of the Department of Health and Human Resources or other persons for a period of three years due to the parent's mental illness, mental retardation, or substance abuse.
(e) No child who is being provided treatment in accordance with a recognized religious method of healing in lieu of medical treatment shall for that reason alone be considered to be a child in need of care for purposes of this Section.
In this case, the State sought termination of K.P.'s parental rights pursuant to La. R.S. 13:1601(B), (D), and/or (F). However, since the children (J, K and T) were adjudged "in need of care and supervision", and not adjudged abused or neglected, the only applicable provision for termination of K.P.'s parental rights is La.R.S. 13:1601(B).
La.R.S. 13:1603(A) provides, in pertinent part, as follows:
A. Whenever the court of proper jurisdiction finds that the allegations of Subsection A, B, C, D, E, or F of R.S. 13:1601 are proven true by the evidentiary standards set forth in this Section, it may order the termination of parental rights of the parent or parents against whom the allegations are proven.
. . . . .
Under Subsection B of R.S. 13:1601, Paragraphs (1) and (2) must be proven by clear and convincing evidence.
Thus, for the trial court to order termination of K.P.'s parental rights in this case, it must find that the State has established by clear and convincing evidence that (1) one year has passed since the rendition of the child in need of care and supervision judgment, (2) K.P. is unfit to rear the children, and (3) K.P. has shown no significant substantial indication of reformation and is unlikely to reform.
*275 On appeal, K.P. does not dispute that the State has proven (1) and (2) [La.R.S. 13:1601(B)(1)] by clear and convincing evidence. She contends the trial court erred in finding she is not likely to reform, and she has shown no significant substantial indication of reformation.
Proof by clear and convincing evidence requires more than "a preponderance of the evidence", the traditional measure of persuasion, but less than "beyond a reasonable doubt", the stringent criminal standard. Succession of Bartie, 472 So.2d 578 (La.1985); Hines v. Williams, 567 So.2d 1139 (La.App. 2d Cir.), writ denied, 571 So.2d 653 (La.1990). Proof by a preponderance requires that the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Hines v. Williams, 567 So.2d at 1141. This distinct standard, persuasion by clear and convincing evidence, is usually applied where there is thought to be a special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds. Hines v. Williams, 567 So.2d at 1141; McCormick on Evidence, Section 340(b) (2d Ed.1972). The rights of parents to the companionship, care, custody and management of their children is a fundamental liberty interest warranting great deference and [vigilant] protection under the law. State in Interest of Three Minor Children, 558 So.2d 1238 (La.App. 1st Cir. 1990). Hence, in enacting La.R.S. 13:1603(A), the Legislature furthered the public policy to protect parents from unwarranted termination of their parental rights.
Whether there has been adequate proof that K.P. has shown no significant substantial indication of reformation and is unlikely to reform is a question of fact. The Louisiana Supreme Court in Rosell v. ESCO, 549 So.2d 840, 844 (La.1989) stated the following regarding appellate review of factual findings of a trial court:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.... The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo....

When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.... But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually *276 never be manifestly erroneous or clearly wrong.... (Emphasis added; footnotes omitted; citations omitted)
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990); Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106 (La.1990).

FACTS
Marsha Hipler, employed by the St. Bernard Office of Community Service, was the initial foster care worker for J, K and T. She served in this capacity from October 9, 1986, to July 7, 1987. She testified that K.P. requested that the State take custody of the children because K.P. had no shelter or source of income to support the children. She stated she placed the children in foster homes and provided services to the children. She supervised the initial visit in October of 1986, of K.P. and the children at Sellers Baptist Maternity Home where K.P. was residing during her fourth pregnancy. There were some minor problems during the initial visits between K.P. and the children, but K.P. corrected these problems.
Bernice Lee, employed by the Department of Social Services in St. Bernard Parish, was the family service worker on the case from November 11, 1986, until July 7, 1987. She also served as a foster care worker for the children from October of 1987, until the time of trial. She stated she initially met K.P. in December of 1986, when she was residing at Sellers Baptist Maternity Home. At this time, K.P. was working toward attaining her Graduate Equivalency Diploma (G.E.D.) by March of 1987. She stated the State's goals for K.P. at this time were for her to obtain her G.E.D., attend parenting class, seek steady employment and provide a stable home for the children. K.P. failed to obtain her G.E.D. while Lee was her case worker because of a conflict with employment. K.P. also failed to attend parenting classes because of a conflict with her G.E.D. classes. K.P. was employed for a one month period while Lee was her case worker, and K.P. sought employment with one other employer. K.P. was consistent with her visitation of the children during this period. K.P. resided at approximately four different locations while Lee was her case worker, and T.P. resided with K.P. at these locations. K.P. generally kept a clean house, was a cooperative and willing participant in the State's program, attempted to work and better herself and appeared to get along good with the children.
Shirley Burrow, an employee of the Office of Community Services for St. Tammany Parish, was K.P.'s family service worker during July, August and September of 1987. She testified she conducted a home study of K.P. and T.P.'s trailer in Slidell, Louisiana, to see if it was properly maintained for visitation by the children. Initially, the trailer was very nice, but it became less and less attractive towards the end of Burrow's involvement on the case. There were problems in the relationship between K.P. and T.P. K.P. and T.P. were eventually evicted from the trailer in September of 1987, and moved into the City Motel in Slidell. K.P. broke off her relationship with T.P. during this period, but when Burrow was removed from the case, the relationship was back on again. She stated that no visits with the children took place during this period because K.P. was having problems with her fifth pregnancy. She also stated that on August 12, 1987, K.P. began working as a waitress at St. Christopher's Curve Inn.
Roseanne Brody, an employee of the Office of Community Services for St. Tammany Parish, served as the case manager for K.P. from October of 1987, until the time of trial. She testified about K.P.'s housing, employment and visitations. Brody first met K.P. on September 30, 1987, at a trailer K.P. and T.P. were living in near Slidell. She stated the condition of the trailer was fair and K.P. lived there until late November of 1987, when K.P. lost her job. K.P. and T.P. then moved to a friend's camp at Pirate's Harbor. T.P.'s brother and a friend resided at the camp. The condition of the camp was dirty, there were *277 dirty dishes in the sink, and garbage was on the porch. K.P. was pregnant at the time and needed help cleaning up. After residing at the camp for three weeks, K.P. and T.P. moved to a junkyard in New Orleans East where T.P.'s foster father worked and lived. Brody never saw the room in which T.P. and K.P. were residing at the junkyard because K.P. said she was staying with friends. K.P. and T.P. stayed in New Orleans East until about January 7, 1988, when their fifth child was born. After this, they moved to an apartment in Chateau Deville Apartments in Slidell. K.P. and T.P. lived in Chateau Deville Apartments from January of 1987, until August of 1988. Brody stated the apartment was in very poor condition. She saw roaches in the kitchen, cat feces on the floor and trash strewn everywhere. She would help K.P. clean the apartment for visits and felt K.P. needed some training on how to maintain an apartment. She helped K.P. get a Housing and Urban Development (HUD) rent subsidy and found a three-bedroom house in Whisperwood Subdivision. K.P. and T.P. moved into the house in mid-September of 1988, and lived there until June of 1989. She stated that near the end of March of 1989, the house was unfit for human habitation. The cabinets were full of garbage, the sink was full of old water and dirty dishes and roaches were all over the kitchen. About this time, K.P.'s fifth child was taken from her and placed in foster care due in part to the condition of the house. Immediately thereafter, K.P. and a friend began cleaning up the house. K.P. began working with a Pathway worker in an intensive six week training program to give K.P. training in house maintenance so she could get back her children. She testified that she later saw the house and it was in an acceptable condition. K.P. stayed in the house until June of 1989, when she lost her HUD rent subsidy because the children were not residing with her. In July of 1989, K.P. (and not T.P.) moved into a house on Howard Street in Slidell which had been unoccupied for several months. The house lacked a refrigerator and range but was in fair condition. All of K.P.'s belongings were boxed up in one bedroom. After two months, K.P. moved to a loft apartment across the street from the house. Brody stated she inspected the apartment in November of 1989, and it was cleaned up and the neatest she had seen. The only problem with the apartment was that it lacked heat.
Brody testified that K.P. was consistent in meeting the visitation schedule set by the State. Brody's agency held several family team conferences which were attended by K.P. K.P. obtained her driver's license and insurance in an effort to provide transportation for her children. Brody stated the agency's goals for K.P. were (1) maintaining housing, employment and a minimally acceptable home, (2) improving her housekeeping skills, (3) maintaining some kind of transportation and (4) attending therapy.
Brody testified that K.P. was first employed at a restaurant called St. Christopher's Curve Inn. She lost this job when the restaurant burned down. K.P. was unemployed for the two months before and after her fifth child's birth. K.P. began to work again on March 10, 1988, at the Union 76 Truck Stop. K.P. worked there for five months and then left. Next, K.P. worked as a cashier at an Exxon station for about five months. K.P. left the Exxon station because her supervisor had only allowed her to work only two nights a week for the last month and she needed a full time job. K.P. went to work on April 1, 1989, at Ryan's Steakhouse as a waitress. Brody was aware of the possibility that K.P. would be sent to a management training program for Ryan's. K.P. was still employed by Ryan's at the time of trial.
Brody testified that K.P. attended therapy at Slidell Mental Health Center (Center) from March of 1988, to June of 1988. She stated the Center discontinued the sessions because K.P. failed to make three appointments. One appointment was missed because of a court hearing in this matter, and another appointment was missed because Brody was unable to bring K.P. In late March of 1989, when T was returned to *278 foster care,[3] Brody brought K.P. to see Gail Fitzmorris, a therapist. K.P. saw Fitzmorris several times until K.P.'s work schedule became took heavy to fit visits in. In October of 1989, Brody again suggested that K.P. seek therapy. Brody stated that K.P. said the therapy was too much to ask of her because of conflicts between work and appointments; however, K.P. did see Fitzmorris another time.
Finally, Brody testified that K.P. began school at the Coastal Training Institute in August or September of 1989. Brody was aware that K.P. was on a twelve month data processing curriculum and also working on her G.E.D. Brody stated that she would agree that K.P. is improving her situation if K.P. has been attending class, working steadily and keeping her apartment clean.
K.P. testified that she terminated her relationship with T.P. in July of 1989, as requested by the State, and stopped living with him at this time. She began working at Ryan's Steakhouse in April of 1989, at a rate of $2.01 an hour, plus tips. She worked six days a week at Ryan's. She has enrolled in Ryan's management training program which is a six-week course. She enrolled in the Coastal Training Institute in the data processing program. She stated that her G.E.D. is part of the program. She has been attending the class and making good grades and will graduate on August 15, 1990. She stated that she has always been consistent with visitations with the children. She attended therapy when possible and saw Fitzmorris twice before the Christmas and New Year holidays. She was scheduled to continue therapy after the holidays. She was presently living in a loft apartment, but has been staying with friends because the pipes in the loft were damaged by a freeze. K.P.'s landlord was going to fix the pipes, but if she didn't, K.P. had saved $900 to get another place. She stated she loved her children and eventually wanted to raise them. She stated she even took a drug test as suggested by Brody, and the results were negative. The condition of the Whisperwood Subdivision house was in large part due to T.P. and his desire to have the children taken from K.P. so he would not be responsible for child support.
Dr. Scuddy Fontenelle, an expert in the field of psychology, testified that he interviewed J, K and T and their parents (K.P. and T.P.) on June 16, 1989. In his report dated July 10, 1989, he made the following observations and recommendations:
1. K.P. is not now able to effectively care, deal with, and manage the behavior of her four children.
2. T, K, and J show positive emotionally [sic] bonding to foster parents and placement within the foster home situations should be maintained as this represents the most optimal placement for proper emotional development of the three children.
3. The three children do not view K.P. as able and capable to manage them and care for them. They view K.P. more as a friend or playmate rather than a mother figure. The three children view foster parents as psychological parent figures.
4. K.P.'s relationship with T.P. is self-destructive. I feel that K.P. still has strong feelings for T.P. and that T.P. is likely to reenter her life. Due to the fact that there have been considerable complications in her life due to the self-destructive relationship with T.P. over the past six months, K.P. has not been able to establish or maintain consistent living arrangement [sic].
I suggest that K.P. be given six to eight months in an attempt to live independently and autonomously, pursue increased independence from T.P. I recommend that she be given contact with her children at least two visits per month, preferably afternoon visits of three to four hour duration, at a convenient St. Tammany Parish location. I do not recommend *279 overnight or extended visits with her children. If K.P. is able to maintain improved social and living arrangement [sic] in her life during the next six to eight months I would recommend gradually increasing contact with her children and having social service staff work with K.P. to gain skills in child rearing and parenting. If K.P. demonstrates that she is unable to live independently and cannot separate herself from T.P., it is imperative that the children be given opportunity to continually bond with foster parents and reduce contact with K.P.
In discussing his recommendations, Dr. Fontenelle stated that K.P. showed strong feelings toward her children and was adamant about maintaining contact with her children and eventually rearing them. K.P.'s maturity level, however, was not sufficient for her to provide a stable home. He felt his most important recommendation was for K.P. to terminate her relationship with T.P. He stated that the recommendations in his July 10, 1989 report were based on satisfying the best interest of the children and not that of K.P. Dr. Fontenelle further testified that if K.P. had maintained steady employment, had terminated her relationship with T.P., and was attending Coastal Training Institute, this would be an indication of her increased ability to handle responsibility and to maintain consistency in her day-to-day life. These items would be in compliance with his recommendations, and increased visitation by K.P. should be allowed. If K.P. had complied with his recommendations, a gradual increase in visitations with K.P. would be in the best interest of the children and termination of this relationship would not be. When questioned by the trial judge, Dr. Fontenelle stated that the children had psychologically bonded with their foster parents and if they were removed from their foster parents, it would be detrimental to the children. He felt the children were better off in foster homes. However, Dr. Fontenelle did state that if his recommendation on a gradual increase in visits was followed, the children would also bond with K.P., and any change in custody would be less detrimental to the children.
Dr. Camilla Cowardin, an expert in child psychiatry, testified that she interviewed J, K, T and K.P., together and separately, and reviewed all other evaluations done in the case. She issued a report dated September 14, 1989, which made the following recommendations:
To use the terminology of the authors of Before the Best Interest of the Child, the "psychological parent/wanted child" relationship has been established between each of these children and the child's respective foster parents. The authors of this widely accepted work point out the fact that the only foolproof way of documenting the existence of this relationship is to separate the child from the parent and observe whether or not there is distress and regression or disruption of behavior. This human experiment, which is condemned, has already been conducted with T with the expected results apparently. Although interviews of children with caretakers cannot discern accurately whether the caretaker has become a "psychological parent", such interviews can document a positive relationship and expected functioning on the child's part that would not have occured [sic] in the absence of adequate parenting. When such a relationship is demonstrated and coupled with a history that a child placed under three years of age has been in the continuous care of the longtime caretaker for one year it can be assumed that the caretaker has become the child's "psychological parent". The caretaker's expressed desire to continue the child's care permanently without ulterior motive can be assumed to document that the child is a "wanted child". Although each of these children continue to be a "wanted child" for the biological mother she is no longer a "psychological parent" for any of them. It is therefore in the best interest of each of these children for the relationship with the respective foster parents, who have become "psychological parents" to be given the maximum protection possible. If damage to young children is to be avoided, in cases such as this one where *280 adolescent girls in state care have babies and no resources for support, programs will have to be developed that allow for mother and child to be maintained together until the mother is self supporting or provides grounds for termination of her rights. In the case of T, K and J it is essential for their future mental health to maintain their relationships with their respective foster parents.
In discussing her recommendation, Dr. Cowardin testified that the children do not view K.P. as a mother figure, but more as a friend. She stated that there was really no effective way for K.P. to become the children's psychological parent (mother figure) without causing detriment to the children. Dr. Cowardin disagreed with Dr. Fontenelle's recommendation stating it would be a disaster for everyone as a result of the children's psychological bonding to their respective foster parents. She did, however, admit that it was not necessary for the mental health of the children to terminate their relationship or visits with K.P. Dr. Cowardin stated that these concerns also arise in divorce custody cases.
Dr. Patricia Aptaker, an expert in the field of psychology, testified that she evaluated T, K.P. and T.P. in February and early March of 1989. Her evaluation was done at the State's request to determine the best interests of T and to see if anything could be done to remedy his educational disabilities. On April 17, 1989, Dr. Aptaker issued a report containing the following recommendations:
1. Regarding the best interests of T, it appears that he does have an attachment to his mother. With the history, observations, and interview material, it appears that T loves his mother, but that he does not view her as adequate to meet his needs and in fact, feels more protective of her. His relationship with his father is less clear, with most of T's references to his father surrounding being punished. T.P. has been a limited caretaker.
Since no observations or interviews were conducted with the [foster] family and T, these relationships cannot be commented on. As mentioned above, T did spontaneously speak of them and was clear in expressing his desire to live with them.
The consistent exposure to parental conflicts, including verbal and physical abuse, is unhealthy for this youth. It appears that the couple has become violent at times and T may be at risk for injury in the midst of the conflicts. Children who live in such an environment are also likely to suffer low self esteem, depression, and behavior problems.
2. Concerning services which might be afforded T, I recommend that your office work closely with T's caretakers and school staff. Given his age and his performance over the last year, I would advise requesting further assessment if he does not appear to benefit from next year's program within the first few weeks of school. I did not formally test T; however, my observations and the report from school suggest attentional problems. If these are apparent in the next school year, further assessment is indicated and psychiatric consultation may be sought.
3. With regard to the prognosis for K.P. to develop and maintain adequate parenting skills for T and his siblings, the picture is not encouraging. K.P. has solid intentions and apparently holds strong feelings for her children. However, her history is riddled with significant difficulties in relating to men, in maintaining independence, and in protecting herself and her children in the often abusive relationship with T.P. Given their history, their relationship would not be expected to improve without significant change on the part of both of them.
In discussing her recommendation, Dr. Aptaker stated that K.P. was more preoccupied with problems with T.P. than with the best interest of the children. K.P. and T.P. needed to seek therapy to correct the problems in their relationship. She felt that K.P. needed therapy to develop her parenting skills. She stated she could not *281 determine if the information on K.P.'s efforts to change her life recently would change her ability to develop parenting skills. Dr. Aptaker also testified that it was possible for a child to have two sets of psychological parents, and she thought this was the situation at the time of her evaluation. Dr. Aptaker agreed with Dr. Fontenelle's recommendation, that if K.P. complied with his suggestions, she (K.P.) should be allowed increased visitations. She stated that visits are different from return of the children permanently to K.P. She stated that if the children have psychologically bonded to foster parents, it may be in their best interest to leave them with their foster parents. However, she did not necessarily think the children should not see K.P. anymore.
Dr. Thomas Roach, an expert in psychiatry, interviewed K.P. on November 9, 1989. In a report dated December 19, 1989, he issued the following recommendation:
Arriving at my recommendations has not been easy and this is certainly not clear cut. The decision is complicated by the fact that K.P. voluntarily had a tubal ligation performed and so can have no other children. K.P. appears to sincerely love her children and she expresses convincingly her concern for their well-being. However, her ability to assume responsibility for four small children is very questionable, given her past history. The well-being of her children must be considered. Her oldest son, T, is manifesting the results of his early, chaotic and unstable home situation. He and K.P.'s two daughters have been placed in apparently stable and supportive foster homes. The foster parents are anxious to adopt them and the children need stability now. They must be assured of being raised in a consistent setting. In her meeting with me, K.P. talked about having her children restored to her at some time in the future, when she has been able to complete her education in computer programming. However, maintaining a full time job and looking after four children is an overwhelming prospect indeed. K.P. has been woefully inadequate at this in the past, and there is little convincing evidence that this has changed. Unfortunately, it is not true that children are always better off with their natural parents. Therefore, I reluctantly recommend that permission be granted for the oldest three children to be adopted by their respective foster parents. (Emphasis in original)
In discussing his recommendation, Dr. Roach stated that his recommendation was based on a one hour interview with K.P. and a review of the other doctors' reports. He was aware K.P. was successfully working as a waitress at Ryan's Steakhouse and under consideration for management training. He was also aware of K.P.'s consistent visitation with the children and her enrollment in the Coastal Training Institute in computer programming. He felt K.P. sincerely loved her children and wanted to be reunited with them and provide them with a stable home. He felt that it was in the best interest of the children that they be adopted by their foster parents who could provide them with a stable environment at this time. However, he felt that if possible, it would also be in the children's best interest to continue their contact with K.P. after adoption.
The trial court in its reasons for judgment stated the following:
THE COURT: Twenty-three. You're very young, and you've had a very short and tragic life so far. It's been filled with many hurts before you took up with Mr., the father of these children, and many, many more since that relationship was continuing and ongoing for many years. You were a child that had children, and you continued to bear children, and there's no disgrace in that, whatsoever. The problem is that, I guess, the nature and society and the pressures of society played a very grim trick on you by virtue of the fact that when you had these children you were not psychologically and emotionally equipped to deal with them and to try to raise them in the proper environment. I think that you are trying to make that change to get *282 back the children. You have earnestly made a try in the last few months.

. . . . .
I find that there has really been no substantial reform. There has been substantial reform from the aspect that you, yourself, are trying to improve your own lot in life which I think you should try to continue to do, but there has been no true substantial reform as far as your status goes as a mother and that chapter is still unwritten.

. . . . .
(Emphasis added)

CONCLUSION
The record contains extensive testimony about K.P.'s past conduct and lifestyle and the changes in these areas which have taken place prior to trial. The testimony indicates that K.P. has shown a significant substantial indication of reformation and that she is likely to reform. The trial judge in his reasons for judgment recognizes the reformation efforts of K.P. The State has failed to prove by clear and convincing evidence that K.P. has shown no significant substantial indication of reformation and is unlikely to reform. The trial court was manifestly erroneous (clearly wrong) in finding otherwise. See State in Interest of Three Minor Children, 558 So.2d at 1244.[4]
SHORTESS and WATKINS, JJ., concur.
COVINGTON, Chief Judge, dissenting.
I disagree with the majority's holding that the trial court was manifestly erroneous in terminating K.P.'s parental rights. His decision is supported by the testimony of each of the four experts who evaluated her, in addition to that of K.P.'s caseworkers.
Scuddy F. Fontenelle, the psychologist whose report the majority relies upon in its reversal, also testified against his own recommendation at the hearing. He did not believe that K.P. would become a maternal figure in the relatively near future. Regarding his suggested time frame of six to eight months for K.P. to show reformation, he stated:
But if I had to specify a set period of time, I'd say itagain, from the chances that she's had, she's hadshe's had quite a number of opportunities to reaffirm her role with the children and of getting her own affairs in order and she's shown a repeated failure to do so. So I really don't know if, you know, within a short period of time is adequate. It would take a considerable amount of time, I feel, possibly years andif she's ever able to do so.
In response to a question by counsel as to whether a defensive, suspicious attitude in a person in K.P.'s situation towards the State was abnormal, Dr. Fontenelle replied:
Well, no. But the fact that Kathy has maintained this relationship and looked at this has a struggle for an extended period of time suggests to me that she really hasn't learned from her prior mistakes and this is something that would caution me in terms of getting her back in dealing with all these children in her household because if she hasn't learned from prior problems she had with the State and she needslet's say she has a problem with one of her children. Who does she call? She's not going to call the State for help because she's struggled with these people and she's had problems with these people all along. Why call a mental health center or why call a State worker who might offer her some guidance in terms of dealing with this problem?
His conclusion was that the children's needs would be met best in their foster homes. His opinion, admittedly formed without knowledge of what had transpired between his examination in June, 1989, and *283 the hearing in January, 1990, was as follows:
... [B]ut having seen [K.P.] in May of 1987, having had opportunity to review her progress from May of 1987 through June of 1989 and seeing the opportunity after opportunity which had been presented to her to get her rehabilitated to the point of accepting these children into her home. And again, she's shown the lack of capacity to get her own affairs in order repeatedly during that time period, that's about a two-year period of time, and even after opportunity after opportunity had been presented to you. So [sic] I feel that since she was unable to show the maturity that was necessary to get her own affairs in order, that her ability to effectively manage the affairs of these children on a day-to-day basis will likely be impaired.
Patricia Aptaker, the other psychologist who evaluated K.P. and her children prior to Dr. Fontenelle's evaluation, stated her impressions as follows:
She was more tuned in to the marital problems than what was in the best interest of the child. I believe she loves her son from what I saw, but she was having more difficulty keeping up with the day-to-day responsibilities of dealing with her husband and trying to deal with the school and I think heras best a psychologist can judge, the history is the best predictor of the future and she had been involved in opportunities to change for several years and apparently had not made much progress.
Dr. Aptaker was then questioned on the prognosis she had given in a written report dated April 17, 1989, which the State placed into evidence. The prognosis was, "With regard to the prognosis for [K.P.] to develop and maintain adequate parenting skills for [T.P.] and his siblings, the picture is not encouraging." Counsel for the State asked the following question and received the following response:
Q If I were to suggest to you that she had not enrolled in any type of counseling and had not enrolled in any type of parenting class, would then your prognosis change in any way for the better or the worse?
A I think it would be, at best, the same and possibly worse.
Dr. Aptaker also felt that the termination of K.P.'s relationship with the father of the children would not, as one factor, change her prognosis of K.P.'s ability to develop and maintain adequate parenting skills "because there's a lot of literature on women who have been in abusive relationships tend to repeat the pattern." While she indicated that she felt she needed more evaluation time with K.P. before she could "contraindicate" Dr. Fontenelle's report and its format for gradually increasing K.P.'s contact with the children, Dr. Aptaker obviously had reservations about it. She stated that "there were many things from her [K.P.'s] past that were not good indicators and just having a job and maintaining a social network would not necessarily ... push me to say return the children."
Camilla Cowardin was one of the two psychiatrists who evaluated K.P.; she saw her on August 7, 1989, after both Dr. Fontenelle and Dr. Aptaker. Dr. Cowardin opined that all three of K.P.'s children had bonded with their respective foster parents, who had become their psychological parents. She was emphatic in her belief that K.P. would be unable to act as the children's parent:
Q Is there anything she could do to become the psychological parent of these children?
A No. She isn't going to become the psychological parent unless she takes over their care and the difficulty is that at this point she can't take over their care without causing them great pain and disruption which is very likely to make it impossible for her to even continue a positive, although not parental, relationship. She has a positive relationship with them now but, if they see her as a threatening figure who is intent on taking them away from their psychological parents, they could very well lose that positive relationship to her and become very rejecting of her. *284 Furthermore, she stated her disagreement with Dr. Fontenelle's proposal on the following basis:
I would say that I have seen case after case where this very seemingly rational recommendation has been made and where it's been a disaster for everybody because as soon as the children realize that visitation is not simply for the pleasure of the interaction at the time of visit but the visitation is preliminary to removing them from psychological parents, they begin to resist the visitation and it becomes an ordeal for everybody. And, eventually, the children become so upset that the psychological parents either have to put them out of the home or they go in the hospital or, you know, it's an unworkable situation.
Finally, Dr. Thomas Roach, another psychiatrist, saw K.P. on November 9, 1988, less than two months before the hearing, and reviewed the reports of the other three experts. He testified that his recommendation was very difficult for him to make because K.P. sincerely loves her children and presented herself in person extremely well. However, he felt that the children should be freed for adoption and based his opinion on the following factors:
What I don't know, the quandary here to me is in person she presented herself extremely well. Her background and her pattern and her judgment has really been very impaired. I mean, no question concerning that. It's been reallyshe had five children and one right after another. There was no restraints about any of this. There was no judgment or idea as of the well-being of the kids that she was having. Plans in the past have been unrealistic. She hasn't sustained things. Efforts to help her have gone awry. It's one thing to be able to take care of yourself individually and perform. It's anotherbeing a parent is a completely different process.
His opinions relating to the welfare of the children were not based on any evaluation of the children themselves, but on "the history of instability and having the chaos that's been going on in her life and in the children's lives." Dr. Roach was sufficiently impressed by K.P.'s situation to state, "this has really been a, really traumatic history as far as the children are concerned and what all's happened. It was sort of a, not much acceptance or not acceptance of responsibility, sort of a minimizing of that."
Dr. Roach saw nothing wrong in some continued contact by the children with their mother. But with regard to increasing the children's contact with K.P., and eventually returning them to her, his outlook was negative. "But I really feel like these kids need to be in a stable situation and I don't see how that, I don't see how that can work."
In addition to the expert testimony, K.P.'s caseworker, Roseanne Brody, testified regarding various incidents during the six-month period following Dr. Fontenelle's evaluation and recommendation and prior to the hearing. She stated that in July and August of 1989, K.P. briefly resided in a three-bedroom, one-bath house which had been vacant for several months prior to her move. In order to authorize the children's visits in that house, it was necessary for the caseworkers to inspect the home. Ms. Brody stated that no visits ever took place at that location because of the condition of the interior, which had no refrigerator or range, and which had not been cleaned by K.P. before or during her residence there. Boxes were left packed, and although K.P. apparently kept one or more cats, there was no litter box in the house. A previous residence had been deemed unhealthy for the children in part because of the presence of cat feces on the carpets, among other reasons. When Ms. Brody suggested that K.P. clean up the home so that visits could take place there, instead of at McDonald's or at a park in New Orleans east, K.P. did not follow up on these suggestions. "She told me that she just did not have time to do what needed to be done."
In September of 1989, K.P. moved again to an apartment across the street from this house. Ms. Brody was not allowed access to this apartment until November, although she picked up and dropped off K.P. several *285 times for visits with the children in September and October. At that time, November 20, 1989, she was allowed inside and saw that the apartment was cleaned up and "the neatest I've seen." However, visits could not be allowed there because the apartment had no heat. At the time of the hearing, on January 3, 1990, the apartment still had no heat. According to Ms. Brody, there were no space heaters and the electrical system was incapable of accommodating even an electric heater because it would blow fuses.
In this case we have testimony from all involved that K.P. did not have and has little or no chance for acquiring parenting skills. She had numerous opportunities to begin "parenting" these children, and each time she failed to take advantage of the opportunity. Every expert agreed they saw little or no hope for the future.
Based upon all of the testimony which was before the trial court when it made the decision to terminate K.P.'s parental rights, I do not believe it was manifestly erroneous. I would affirm the trial judge's determination that the testimony, expert and otherwise, comprised the clear and convincing evidence required for the termination of K.P.'s parental rights.
I respectfully dissent.
NOTES
[*] Judge Mary Ann Vial Lemmon is serving as judge pro tempore by special appointment of the Louisiana Supreme Court to fill the vacancy created by the death of Judge Steve A. Alford, Jr.
[1] K.P. was 23 years old at the time of this hearing in January, 1990. She has given birth to the following children:

T: DOB 12/7/83 Subject of this suit.
K: DOB 12/28/84 Subject of this suit.
J: DOB 10/31/85 Subject of this suit.
D: DOB 6/5/87 Given up for adoption
 to the foster
 parents of J.
C: DOB 1/7/88 In foster care since
 March, 1989 but
 not subject of this
 suit.
She has undergone a tubal ligation.

[2] The relevant federal guidelines, found in 42 U.S.C.A. 627 and 42 U.S.C.A. § 675, must be complied with in order to be eligible for foster care funding.
[3] A review of the record reveals that the State has complied with both state and federal foster care review guidelines. See R.S. 46:2411 et. seq. and 42 U.S.C.A. §§ 627 and 675.

A case review system was instituted, which included the preparation and filing of a case plan every six months. The case plans are dated 10/15/87, 4/28/88, 10/26/88, 4/19/89, and 10/4/89. While all of the previous case plans stated reunification as the goal, the final plan (dated October 4, 1989) recommended adoption of the three children by their respective foster parents, with whom they had resided since they were taken into custody in October of 1986. Each case plan sets forth the objectives and permanency plan, as well as "a plan for assuring that the child receives proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own home or the permanent placement of the child, and address[es] the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan," as set forth in 42 U.S.C.A. § 675(1).
Each case plan outlines provisions for parental visitation and includes a "Team Conference Confirmation." All of the team conferences, with the exception of one, were attended by K.P., the case manager, case supervisor, Family Service worker, Administrative Reviewer, Foster Care worker and a foster parent for each child.
In addition to the case plan review system, this case was subjected to judicial review a minimum of once every six months prior to the filing of the Petition for Termination of Parental Rights.
Including the initial court order removing the children from the parents' home and prior to the Petition for Termination, the case was reviewed by the court on 10/9/86, 10/14/86, 12/4/86, 5/21/87, 12/8/87, 6/14/88, 11/16/88 and 5/17/89. On May 17, 1989, the court ordered a "bonding assessment," apparently to determine whether the children view the biological parents or the foster parents as their psychological parents. This court order was issued after the filing of both a case plan and a letter from the State child welfare agency (DSS) recommending adoption rather than reunification and outlining the reasons for the recommendation.
[1] The order indicates it was signed by the trial court on September 25, 1989. However, the order states it was ordered and filed on November 27, 1989. Apparently, the date of signing the order was incorrectly typed as September 25, 1989, instead of November 25, 1989.
[2] T.P. is the biological father of the five children born to K.P. He and K.P. lived together but were never legally married.
[3] T was returned to K.P.'s custody on a trial basis. He lived with K.P. from October 31, 1988, until March 29, 1989. He was returned to foster care because he was having difficulty in school, K.P. was having difficulty providing transportation, and K.P.'s home was dirty.
[4] The record contains extensive testimony as to whether termination of the parental rights of K.P. is in the best interest of the children. This testimony, although enlightening, is irrelevant to our decision in this case because it is not an element of this type of action. La.R.S. 13:1601(B).