WATKINS, Judge.
The State Department of Health & Human Resources appeals from a trial court judgment denying the state’s motion to terminate the parental rights of RK, the mother of CH, RH, and EN.[1]
The defendant’s three daughters were taken into state custody pursuant to an instanter order filed July 20, 1987. The order was based upon allegations of abuse by the mother’s boyfriend, JH, with whom the mother and three children were living.[2] On August 25, 1987, the court adjudicated the children as “children in need of care”. The children were placed together in a foster home; they were moved approximately 10 months later to a second foster home because of their special needs.[3] They have remained in the latter foster home since that time, and the foster parents wish to adopt all three children.
Since the children were taken into state custody in July 1987, timely review hearings were held on January 6, 1988; July 6, 1988; February 1, 1989; July 26, 1989; January 12, 1990; May 29, 1990; and December 17, 1990. The plan for the children changed from reunification to termination of parental rights at the May 29, 1990 and December 17,1990 hearings because family reunification allegedly was not feasible.
A petition to terminate the parental rights of the mother, RK, was filed on July 13, 1990, alleging that RK is an “unfit” parent within the meaning of LSA-R.S. 13:1600(6), for the following reasons:
1. She is unable to provide a safe, stable home and environment for her children, either now or in the reasonably near future.
2. She had been psychiatrically diagnosed as having a dependent personality disorder and dysthymia.
3. Reasonable efforts or services for family reunification have been made, but these efforts or services have met with little success.
A termination hearing was held on March 11, 1991, and April 8, 1991. On June 25, 1991, Judge Remy Chaisson denied the termination of parental rights and further ordered that the children be placed *852 in a different foster home.[4] Judge Chais-son, in oral reasons, stated that he believed that the state’s efforts towards reunification in this case were lacking. He stated that the evidence showed that the state placed the children with someone who was going to adopt them and, as an end result, ill feelings developed between the foster/prospective adoptive parents and the mother. The court went on to state that:
In this case the mother has done everything the Agency requested of her. You don't have to have any particular IQ in order to be a mother. She had these children, and they belonged to her, and they can get reattached to her just as easily as they got attached to these strangers in foster care.
The law is very specific in that children’s rights are paramount, but parents’ rights are important, too, and these rights are not to be lightly taken away from them. I think the course that the State took with pitting the proposed or perspective adoptive parents against the natural mother created a conflict, and, certainly, the mother has always shown up for Court, and she has always done this and that, and she has cooperated with everything you wanted her to do, and when you have a situation like that, you have to continue to work towards reunification, and you can’t impose adoption at that stage.
The plan of this Court was reunification, and when the court said to try to reunite, the Agency was working towards adoption because they had already made a commitment to the foster parents, and that, to me, does not give the mother the proper chance.
On appeal the state alleges the following assignments of error:
1. The Juvenile Court erred when it found that the State agency’s efforts toward family reunification were lacking.
2. The Juvenile Court was manifestly erroneous in its interpretation of the facts and evidence, regarding the children’s placement and case plan.
3. The Juvenile Court erred in its interpretation of “the best interest of the children” standard.
LAW
Pursuant to LSA-R.S. 13:1601,[5] a court on its own motion may order the district attorney to petition, or the district attorney in his discretion may petition for the termination of parental rights of the parent or parents of an abused,[6] neglected,[7] or other child within a juvenile court’s jurisdiction, when the grounds set forth in the petition meet all the conditions set forth in Subsections A, B, C, D, E, or F of Section 1601.
According to the state’s petition, it seeks to terminate the mother’s parental rights under LSA-R.S. 13:1601 B. and/or D.
LSA-R.S. 13:1601 B. provides:
B. (1) One year has passed since the rendition of an abuse or neglect judg *853 ment or child in need of care judgment, as defined in R.S. 13:1600(7),[8] pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
(2)The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
LSA-R.S. 13:1602 D. provides:
D. (1) The child has been in the custody of a child welfare department or other person, pursuant to a judicial order, for a period of at least one year.
(2) The child was removed from the custody of the parents by judicial order due to the parent’s abuse or neglect of the child.
(3) The parent is unfit to retain parental control and there is no reasonable expectation of reformation on the part of the parent or parents.
(4) The child is an abused or neglected child, the Department of Health and Human Resources has made every reasonable effort under the circumstances to reunite the child with his parents, and the department recommends that it would not be in the best interest of the child to be reunited with his parents.
Because the children in the instant case have been adjudged to be “in need of care and supervision,” and not adjudged to be abused or neglected, the only applicable provision for termination of RH’s parental rights is LSA-R.S. 13:1601 B. Furthermore, there is no dispute that one year has passed since the rendition of the judgment that the children were in need of care. Accordingly, we will review the record to determine whether the trial court erred in determining that the state failed to prove by clear and convincing evidence[9] that RH is (1) unfit to rear the children and (2) that she has shown no significant substantial indication of reformation and is unlikely to reform.
The “clear and convincing” standard of proof required when terminating parental rights was recently explained in State in Interest of J, 582 So.2d 269, 275 (La.App. 1st Cir.), (Lanier, J. concurring), writ denied, 583 So.2d 1145 (La.1991).
Proof by clear and convincing evidence requires more than ‘a preponderance of the evidence’, the traditional measure of persuasion, but less than ‘beyond a reasonable doubt’, the stringent criminal standard. Succession of Bartie, 472 So.2d 578 (La.1985); Hines v. Williams, 567 So.2d 1139 (La.App.2d Cir.), writ denied, 571 So.2d 653 (La.1990). Proof by a preponderance requires that the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Hines v. Williams, 567 So.2d at 1141.
Whether RK is unfit to raise her children, whether she has shown no significant substantial indication of reformation, and whether she is unlikely to reform are ques *854 tions of fact. State in Interest of J, 582 So.2d at 275, (Lanier, Jr. concurring). These determinations by the trial court will not be set aside in the absence of manifest error. Id.
LSA-R.S. 13:1600(6) defines an “unfit parent” as follows:
(6) “Unfit” refers to a parent:
(a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration to the child, or who has sexually abused, exploited, or overworked a child to such an extent that his or her health, moral or emotional well-being is endangered; or
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services in accordance with the tenets of a well recognized religious method of healing with a reasonable proven record of success. Financial inability alone shall not constitute grounds for termination of parental rights; or
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
The three minor children were removed from RK’s care primarily because of her failure to protect them from her abusive boyfriend with whom she and her children lived. Although RK remained with the boyfriend for a short time after the children were removed, she later cooperated with the district attorney’s office in filing charges against JH for sexual molestation of her children. Since that time RK has completed a Vo-Tech course and has worked in several minimum wage jobs. She attended all requested therapy sessions at the Slidell Mental Health Center, as well as the parenting classes offered through the Office of Community Services. RK has attended all the family team conferences held by the Office of Community Services, and attended all except one of the court hearings in this matter. She has also visited with the children as often as the state would permit. During this time RK lived with various friends and relatives and had no stable home. However, in May 1989, she moved in with the man whom she married in June of 1990. Her husband maintains a stable job, and RK continues to work at various minimum wage jobs.
The state’s witnesses in this matter included two experts in psychiatry, an expert in clinical psychology, case workers with the Office of Community Services, and case workers with Associated Catholic Charities.
Dr. Thomas Roach, an expert in psychiatry, testified that he interviewed RK on March 22, 1990, eleven months before the termination hearing. Dr. Roach described RK’s long history of transient, dependent, destructive relationships and RK’s inability to sustain any type of employment or independent living arrangement. In a report made after his interview, Dr. Roach stated that his decision to recommend termination of parental rights was very difficult because “there is no question that [RK] genuinely loves her children, desperately wants them returned, and is currently making an honest effort to meet the Judge’s requirements. Nevertheless, the daughters’ well being must be considered, and the possibility of [RK’s] establishing a satisfactory and stable environment for her daughters is slight.”
Dr. Camilla A. Cowardin, another expert in psychiatry, testified that she met with the children and RK on January 9, 1990. During her interview with the children, the two older children expressed a desire to remain with their foster parents, and they did not want to visit their mother; the two-year-old stated that she liked to visit her mother. All of the children referred to the foster parents as “Mom and Dad.” Dr. Cowardin recommended that all three children remain in foster care, as they are very attached to the foster parents and are gradually accepting the foster parents as psychological parents. Dr. Cowardin also noted RK’s habitual dependence on a man *855 to provide financial and emotional support. In a report made after her interview with RK and the children, Dr. Cowardin concluded that, “It appears that, through no fault of her own, [RK] has developed a personality disorder that prevents effective, independent functioning. No amount of ‘parent training’ will effect this personality structure but it is possible that, if she establishes a successful marital relationship, such a relationship might supply the necessary support to allow some gradual healthy growth and personality development.” Dr. Cowardin also noted that RK was not able to empathize with the children and was constantly struggling with the children about their relationship with their foster parents.
Dr. Mary Munger, an expert in clinical psychology, testified that she saw RK in March and April of 1990, and administered several tests. The results of the tests revealed that RK is intellectually between borderline and mild mental retardation and has a fifth grade level of word recognition. The testing also revealed that RK is under a lot of stress, is preoccupied with herself, tends to blame others for her problems, is dependent and looks to others for guidance. Dr. Munger believes that RK desperately wants her children and is trying to do what is asked of her. However, Dr. Munger stated that RK would have a very difficult time parenting these children because of her intellectual limitations, her inability to accept her limitations, and her inability to accept help. Dr. Munger also believed that RK is very vulnerable and is often unable to take care of herself. Dr. Munger did admit that, other than the limitations regarding her personality, RK had not done anything wrong.
The remaining state witnesses were case workers employed with the Office of Community Services and the Associated Catholic Charities. The cumulative testimony of these witnesses revealed that RK has done everything that the state has requested and that during her efforts to regain the custody of her children the state came close to returning her children to her on a couple of occasions. Nevertheless, the general consensus was that since the time the children were removed from her care RK has improved her parenting skills only slightly, and her relationship with her children has greatly deteriorated. This consensus was based on supervised visits between RK and the children.[10] Generally the visits with the children were described as “poor” because RK would often be overwhelmed by personal problems, and she would expect the children to listen to her and empathize. During the time that the children were in foster care, all the visits with RK were supervised with the exception of several weekend visits. The unsupervised visits were discontinued, however, because of reports from the children that they were spanked and because several minor bruises were found on the children. Investigations were made concerning these allegations, and the state was unable to validate any abuse by RK.
The case workers also reported that the two oldest children would display behavioral problems before and after the visits with their mother, and they would often refuse to visit with her. During the spring of 1990, it was reported that RK was telling the children that if she did not get them back, she was going to kill herself; at one visit RK showed the oldest child a knife she had in her purse. The ease workers also testified that RK would use the visitation time to argue with the case workers and the children. RK also made allegations against the foster parents in an attempt to undermine the children’s relationship with them.
The case workers believed that to the best of her ability RK took advantage of the services that the state 'offered to her, but that these services did not improve her ability to provide a stable environment supportive of the overall health of her children; nor did they improve her ability to nurture her children and protect them. They believed that it was in the best inter *856 ests of the children to terminate RK’s parental rights because they do not feel that the children should remain in this situation until RK can improve her skills. It was agreed that RK’s relationship with her present husband stabilized her situation, but the case workers were concerned that the husband did not make more of an effort to attend the team conferences with RK. The case workers did admit that RK’s husband had attended visits with the children and that he appeared to get along well with them. The case workers were also concerned that RK was once again dependent on another person to provide a home for her and that she was never able to support herself independently. The case worker investigating the home of RK and her husband testified that it is a clean, adequate home, with room for the children, but that RK was very hostile to her. This case worker admitted that she never told RK that if her situation improved the state would reconsider its decision to seek termination of her parental rights.
RK and her husband testified that they had been living together since May of 1989, and that they have been married since June 1, 1990. RK’s husband has been employed by Sonat since 1988, earning approximately $30,000 per year, and they have resided at the same apartment for two years. RK’s husband testified that he wants the children to live with him and RK, and he believes he can be a good father to the girls.
After a thorough review of the record we do not believe that the trial court abused its discretion in denying the state’s petition to terminate RK’s parental rights. This is one of those extremely difficult matters the state and its courts are called upon to decide. As a court of review we cannot say that the trial court’s factual findings are clearly wrong in view of the clear and convincing standard which must be applied. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Rosell v. ESCO, 549 So.2d 840 (La.1989). The state did not establish by clear and convincing evidence that RK has not shown any significant substantial indication of reformation or that she is unlikely to reform. Although RK is limited intellectually, and her basic personality has changed very little, the record shows that she has made significant strides in stabilizing her personal life and educating herself since her children were removed from her care. As all the state’s witnesses pointed out, RK loves her children very much and has tried to do everything the state requested of her. RK has tenaciously fought to retain her parental rights in the face of limited abilities and a tragic personal life. While it clearly appears to be in the best interests of the children to maintain their custody with the state, we do not find that the requirements for termination of RK’s parental rights were proven in this proceeding.
For the reasons set forth the judgment of the trial court is affirmed.
AFFIRMED.

. The respective birth dates of the children are:
CH — DOB, August 4, 1979
RH — DOB, November 15, 1982
EN — DOB, April 1, 1985

. JH was ultimately convicted of sexually molesting the children.

. The two older children were exhibiting inappropriate sexual behavior and were in need of special care to help them deal with what had happened to them. Because of these problems, the Office of Community Service contacted Associated Catholic Charities and sought placement of the children in the Therapeutic Family Care program sponsored by Associated Catholic Charities. This program provides supervised foster homes to children with special needs.

. The state took writs on the court’s order to move the children from their present foster home, and this court, under docket number 91 CW 1348, reversed the order stating that "[o]nce the juvenile court has assigned custody of the children to the Department of Social Services, the Department has the authority to determine where the. children should be placed. If the court determines the children are not being properly cared for, it may remove custody from the Department and place it elsewhere, State in the Interest of Sapia, 397 So.2d 469 (La.1981). See also, State in the Interest of S.S., 499 So.2d 1198 (La.App. 5th Cir.1986).”

. We note that LSA-R.S. 13:1600 to LSA-R.S. 13:1606 have been repealed by Acts 1991, No. 235, § 17, effective January 1, 1992, in conjunction with the enactment of the Louisiana Children's Code, LSA-C.Ch.C. arts. 100-1657.

. LSA-R.S. 13:1600(1) provides:
(1) "Abused child” is a child against whom has been inflicted physical or mental injury which causes severe deterioration to the child, including a child who has been abused sexually or a child who has been exploited or overworked to such an extent that his health, moral, or emotional well-being is endangered.

. LSA-R.S. 13:1600(2) provides:
(2) “Neglected child” is a child whose parent or parents, although financially able to do so, have consistently refused to provide reasonably necessary food, clothing, shelter, or medical service. No child who is being provided treatment in accordance with a recognized religious method of healing in lieu of medical treatment shall for that reason alone be considered to be neglected or abused.

. LSA-R.S. 13:1600(7) provides:
(7) "Child in need of care" means a child:
(a) Whose parent inflicts or allows the infliction of physical injury or sexual abuse upon the child which seriously endangers the physical, mental, or emotional health of the child.
(b) Whose physical, mental, or emotional condition is threatened or impaired as a result of the refusal or neglect of his parent to supply the child with necessary food, clothing, shelter, or medical care, or as a result of the parent’s neglect or imposition of cruel punishment.
(c) Who is without necessary food, clothing, shelter, or medical care because of abandonment by, or the disappearance of, his parent.
(d) Who has been placed in the custody of the Department of Health and Human Resources or other persons for a period of three years due to the parent's mental illness, mental retardation, or substance abuse.
(e) No child who is being provided treatment in accordance with a recognized religious method of healing in lieu of medical treatment shall for that reason alone be considered to be a child in need of care for purposes of this Section.

. LSA-R.S. 13:1603 A. provides that "[u]nder Subsection B of R.S. 13:1601, Paragraphs (1) and (2) must be proven by clear and convincing evidence.”

. Since the children were removed from RK’s care, visitation has varied from weekly to every three weeks.