649 So.2d 512 (1994)
STATE of Louisiana In the Interest of Q.P.
No. 94-609.
Court of Appeal of Louisiana, Third Circuit.
November 2, 1994.
*514 Leah Antoinette Beard, for State Dept. of Social Services.
Harold Dewey Register Jr., for Theresa Payne.
Gregory James Doucet, for Devon Whyte.
Ferdinand John Iseringhausen, for Q.P.
Before GUIDRY, C.J., and KNOLL and WOODARD, JJ.
KNOLL, Judge.
This appeal concerns the termination of parental rights. The State of Louisiana initiated this action pursuant to the provisions of LSA-Ch.C. Art. 1015 to terminate the parental rights of Theresa Ann Payne and Devon Whyte, an incarcerated person, with respect to their two year old son, Q.P. After conducting a hearing on the State's petition, the juvenile court terminated the parental rights. Theresa and Devon appeal.
Theresa contends that the juvenile court erred: (1) in denying her motion to have a psychiatrist examine her; and, (2) incorrectly terminating her parental rights.
Devon contends that the juvenile court erred: (1) in finding that he abandoned and failed to support Q.P. as delineated in LSA-Ch.C. Art. 1015(8) and (9); and, (2) in finding that the State met its burden of proof as required in LSA-Ch.C. Art. 1035.

FACTS
Q.P., a male child, was born on July 31, 1990, at Opelousas General Hospital in Opelousas, Louisiana. Theresa Ann Payne, 20 years of age, is listed on the birth certificate as Q.P.'s mother. Although no father is designated on the birth certificate, Devon Whyte informally acknowledged in various letters that Q.P. was his child. Devon Whyte was incarcerated at the time of Q.P.'s birth and remained incarcerated at the time of the termination hearing, serving a 14 year sentence in federal prison on a conviction for distribution of cocaine.
On September 11, 1990, Q.P. was admitted to Opelousas General with a diagnosis of severe diarrhea and dehydration. Because of the severity of his condition, he was transferred the following day to the pediatric unit at Tulane Medical School Hospital (Tulane Medical) in New Orleans. Tulane Medical confirmed Q.P.'s initial diagnosis and discovered that he also suffered a large intraparenchymal hemorrhage with extension into the brain's ventricular system, which caused Q.P. to begin to experience seizures. Because of the brain hemorrhage, Dr. Diane K. Alfrick, a pediatric neurologist, suspected child abuse and monitored the case accordingly. Q.P. remained in pediatric intensive care for 10 days after his admission to Tulane Medical. During this time, Theresa Payne, Q.P.'s mother, was absent from the hospital.
On September 21, 1990, Theresa visited Q.P. in Tulane Medical and left again. Because of the need for parental consent for a surgical procedure, the sheriff's personnel had to locate and return Theresa to Tulane Medical. On September 22, Theresa left the hospital and attempts to contact her were not successful. In the course of Q.P.'s treatment at Tulane Medical, a VP shunt was placed into his skull to relieve pressure on the brain.
Based on Theresa's failure to make herself accessible to the doctors at Tulane Medical and her failure to provide adequate care for Q.P. during his hospitalization, the Department of Social Services (DSS) obtained custody of Q.P. on October 12, 1990, pursuant to an instanter order issued by the Opelousas City Court. On December 12, 1990, the Opelousas City Court adjudicated Q.P. a child in need of care and placed him into DSS's custody. Since that time DSS placed Q.P. in the care and custody of a foster parent, Yvonne Miller.
In the following years, DSS worked with Theresa in order to have Q.P. returned to her custody. After various home studies, contacts with Devon Whyte, and Theresa's failure to participate in random drug testing and counseling, DSS initiated this termination action on November 4, 1992. After several continuances, a hearing was held on DSS's petition. On September 27, 1993, the juvenile court signed a judgment terminating Devon and Theresa's parental rights.

*515 DENIAL OF THERESA'S MOTION FOR A PSYCHIATRIC EXAMINATION
Theresa first contends that the juvenile court erred in denying her pre-trial motion to have a psychiatrist examine her as provided by LSA-Ch.C. Art. 1026.
From the outset, we note that the record does not contain the written motion which Theresa contends was filed and denied by the juvenile court on September 8, 1993. It is axiomatic that an appellant has the burden of making sure that the record contains all of the documents relied upon in seeking appellate review. In the absence of such documentation, the appellate court is powerless to review the alleged error. Moreover, although Theresa attaches a photocopy of the alleged document to her brief, it is well settled that an appellate court may not consider such evidence since it is not contained in the appellate record. Accordingly, we find that this issue is not properly before us.
Furthermore, even assuming arguendo that this issue is properly before us, we find no clear error in the trial court's denial of Theresa's motion.
LSA-Ch.C. Art. 1026 provides that a juvenile court "may order physical or mental examination or evaluation of any party...." (emphasis added). From the permissive wording of Article 1026, it is clear that the juvenile court is not required to order physical or mental examinations. Accordingly, before reversing the juvenile court on this issue, we must first find that the juvenile court abused its discretion in failing to order such an examination.
In the case sub judice, the juvenile court had before it psychological examinations of Theresa which Dr. Al Buxton, a clinical psychologist, conducted in October 1990 and on September 10, 1992, which showed that he thoroughly tested and extensively interviewed Theresa. These two medical reports were introduced into evidence at the beginning of the trial, without objection. Based upon this evidence, we do not find that the juvenile court abused its discretion in failing to require additional testing and mental examinations.

TERMINATION OF THERESA'S PARENTAL RIGHTS
In her next assignment of error, Theresa contends that the juvenile court erred in terminating her parental rights. She argues that: (1) the case workers were not objective in their presentation of the facts which pertain to Q.P.; (2) the State failed to offer substantial proof of Theresa's drug problem; and, (3) DSS has not made serious efforts to reunite Theresa and Q.P.
Parental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law. State in the Interest of C.P., 463 So.2d 899 (La.App. 2 Cir.1985). On this basis, the Louisiana legislature imposed statutorily strict procedural and evidentiary requirements which must be met before issuance of a judgment terminating parental rights. As explained in State in the Interest of J, 582 So.2d 269 (La.App. 1 Cir.), writ denied, 583 So.2d 1145 (La.1991), the evidentiary standard established in termination cases mandates that the State present proof by clear and convincing evidence of the parents' failure to comply with all the enumerated conditions relied upon in the specific paragraph(s) of LSA-Ch.C. Art. 1015 before terminating parental rights. Accordingly, this heightened burden of proof requires the State to show not only that the existence of the fact sought to be established is more probable, but rather that the fact is highly probable or more certain. Hines v. Williams, 567 So.2d 1139 (La.App. 2 Cir.), writ denied, 571 So.2d 653 (La.1990). However, we are mindful that in assessing whether the clear and convincing evidentiary standard was followed in the lower court, we must determine whether the record reflects that the juvenile court manifestly erred. Rosell v. ESCO, 549 So.2d 840 (La.1989).
In the case sub judice, the State relies upon paragraph (5) of Article 1015 in its petition to terminate the parental rights of Theresa. This paragraph provides:
"(5) Prior adjudication as a child in need of care and removal from the parental home

*516 (a) One year has elapsed since a child was removed from the parent's custody pursuant to a court order in a child in need of care proceeding and placed either in the custody of an agency or individual.
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.
(c) The department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child."
Compliance with paragraph (5)(a) of Article 1015 is well established in the record. The Opelousas City Court adjudicated Q.P. a child in need of care on December 12, 1990, and he was placed into the custody of DSS at that time. Subsequently, the State did not initiate termination action until November 4, 1992, well beyond the one year delay.
Theresa initially contends that DSS case workers were not objective in their presentation of the facts. LSA-Uniform Rules, Courts of Appeal, Rule 2-12.4, requires that the appellant make specific reference to the place in the record which contains the basis for the alleged error; if an assignment of error is not briefed in accordance with Rule 2-12.4, the appellate court can consider it abandoned. In the present case, Theresa cites no examples from the record to support her conclusionary complaint. Accordingly, we find that this assignment of error is abandoned, since it presents nothing for appellate review.
Theresa next argues that the State failed to present substantial proof of her alleged drug abuse, her unfitness as a parent, and the unlikeliness of her reformation.
Whether Theresa is unfit to raise her child, whether she has shown no significant substantial indication of reformation, and whether she is unlikely to reform are questions of fact. State in the Interest of J, supra. Accordingly, the trial court's determination of these factual questions will not be reversed in the absence of manifest error. State in the Interest of CH, 599 So.2d 850 (La.App. 1 Cir.1992).
LSA-Ch.C. Art. 1003(10) defines "unfit" as follows:
"[A] parent:
(a) Who has abused a child by inflicting physical or mental injury which causes severe deterioration to the child, or who has sexually abused, exploited, or overworked a child to such an extent that his or her health or moral or emotional well-being is endangered.
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment either by medical care or other health services in accordance with the tenets of a well-recognized religious method of healing with a reasonable proven record of success. Financial inability alone shall not constitute grounds for termination of parental rights.
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior."
The record shows that Q.P.'s medical condition requires that he remain in a very structured environment. Tulane Medical diagnosed him with suspected blindness, stomach problems, a brain hemorrhage, and seizures. In addition, Tulane Medical surgically inserted a shunt into Q.P.'s skull to relieve swelling, and Q.P. has further difficulty walking because of bent legs and feet. As a result, Q.P. is on a special diet, receives phenobarbital to control his seizures, has regular neurological examinations for his seizures, undergoes frequent medical examination to check on the shunt placed in his skull, has the level of phenobarbital closely monitored so that his seizures are properly controlled, undergoes physical therapy at the hospital monthly, and receives daily two-hour physical therapy sessions at home.
The juvenile court evaluated Theresa's unfitness in light of Q.P.'s medical condition and stated:

*517 "The Court feels that the mother is certainly not able or capable to handle a handicapped child of this magnitude, even though she does have a healthy child who resides with her. The Court does not feel that the mother [Theresa] was honest with the Court relating to her substance abuse problem. The only time that the mother is concerned about addressing her substance abuse problem is when she is faced with parental rights being terminated.
The agency [DSS] and the Court have asked the mother many times to attend Substance Abuse, and, she has refused. The Court was not impressed with the witnesses who testified on behalf of the mother. The witnesses denied their use of drugs, etc., and, denied substance abuse by the mother. The witnesses knew, or should have know [sic] without any doubt, that the mother had a substance abuse problem that more than likely caused and/or contributed to the injury of the childand is responsible for the child being handicapped. Credibility of the mother's witnesses is lacking.
The best interest of the child, insofar as the doctors at Tulane University are concerned, is that the child should be permanently placed with the foster mother. She [the foster mother] has demonstrated herself to be a loving, caring, and knowledgeable caretaker of this handicapped child. The staff at Tulane University feels that removal of this child from the specialized training that is needed and required would be detrimental to the child's best interest...
The child needs specialized training and care, and the Court does not feel that the mother is able, under the circumstances and the conditions in which she lives, to provide the kind of specialized training needed by [Q.P.] She is able to care for [her other child at home] ... because that child does not require specialized training... The Court is of the opinion that [Q.P.] needs a structured environment ... The Court does not feel that the mother can adequately care for the needs of the child and will never be in a position to do so before the child is eighteen (18) years of age.
* * * * * *
The Court was very impressed with the testimony of long-time Opelousas Police Captain Paul Gennusso [the mother's neighbor]. Officer Gennusso's testimony indicated the `heavy traffic' at the mother's home and the suspected drug activity in and around the residence of the mother. Many of the mother's relatives have been either charged or convicted of drug charges."
Dr. Buxton, the psychologist who examined Theresa, stated that she underestimates the difficulty in caring for Q.P.'s handicaps and opined that she cannot act as the primary caregiver. Similarly, DSS conducted home studies of Q.P.'s maternal grandparents and aunt, but determined that neither household was suitable for caring for Q.P.'s various physical disabilities. Lastly, it is unrefuted in the record that although Theresa met with DSS and Q.P. at scheduled visitations, she never met DSS's requirement that she participate in random drug testing and attend substance abuse counseling.
After carefully reviewing the record, we find that the State proved the elements of Article 1015 with clear and convincing evidence, and that the juvenile court's termination of Theresa's parental rights is fully supported.

TERMINATION OF DEVON WHYTE'S PARENTAL RIGHTS
Devon contends that the State failed to prove its case by clear and convincing evidence that he either deserted or abandoned Q.P., as provided in LSA-Ch.C. Art. 1015(8) and (9). He asserts that the fact of his incarceration alone was insufficient to terminate his parental rights.[1]
*518 From the outset, we note that the State concedes in brief that it failed to prove that Devon deserted Q.P. It points out that it did not prove that Devon's whereabouts were not known. In fact, it was well known to the State that Devon was incarcerated in a federal prison and communicated with him. Accordingly, we will focus on the State's other assertion that Devon abandoned Q.P.
LSA-Ch.C. Art. 1015(9) provides:
"Abandonment of the child
(a) The child has been abandoned by his parent for a period of at least four months.
(b) The parent has failed to provide for the child's care and support, without just cause, thus demonstrating an intention to permanently avoid parental responsibility."
Under this provision, the State was required to show that Devon abandoned Q.P. for a period of at least four months and that he failed to provide for his care and support without just cause. State in the Interest of JL, 636 So.2d 1186 (La.App. 3 Cir.1994).
In the case sub judice, it is undisputed that from the date of Q.P.'s birth through the time of the termination hearing, Devon was incarcerated in a federal prison. Jeff Soileau, a DSS case worker, testified that he first contacted Devon in February 1992, at which time he provided him with the Louisiana abandonment law. Devon responded, asserting that he did not want his parental rights terminated. Devon further provided the name and telephone number of a woman, Brenda Francis, who was taking care of his business during his incarceration; when this telephone number was called, the party answered denying any familiarity with Devon.
Devon next telephoned DSS in March of 1992. At that time he reasserted his opposition to the termination of his parental rights and provided the name of a non-relative with whom he thought Q.P. could be placed in foster care. DSS advised him that placement with a non-relative was not possible.
The next contact with Devon came in October 1992. At that time Jeff Soileau mailed Devon a family team conference packet and case plan. Devon telephoned DSS in November 1992, asking about Q.P. and offered his father, a Washington, D.C. resident, as a possible home placement for Q.P. In that conversation, DSS advised Devon to get in touch with his father in Washington, and to have him contact DSS. The record does not show that Devon's father contacted DSS after this conversation.
The record further shows that Devon sent a letter on December 28, 1992, to Helen Castellini, an attorney appointed to represent him in these termination proceedings. In that letter Devon: (1) expressed a willingness to formally acknowledge Q.P. as his child and asked that she forward the necessary documents for his signature; (2) restated his opposition to the termination of his parental rights; (3) suggested that his family would be willing to care for Q.P.; (4) asked if there were any needs which Q.P. had which either he or his family might provide; and, (5) requested a recent photograph of Q.P.
Helen Castellini responded and asked Devon to provide addresses of his family members who might take care of Q.P. during his incarceration. Devon answered by giving her the name, address, and telephone numbers of his father and sister in Washington, D.C., as well as that of Adreann Rodriquize, his fiancee, in Houston, Texas. However, later correspondence indicates that Devon's father had returned to Jamaica, his native country.
Jeff Soileau stated that Devon has never supported Q.P. and never requested to visit with him. He further stated that he contacted the Bureau of Prisons and determined that Devon's release date was March of 2004.
Returning now to the role of the fact finder, the jurisprudence states that ultimately the juvenile court is left to determine whether the totality of the circumstances indicates an intent to permanently avoid parental responsibility and abandonment of the child. State in the Interest of P.R.B., 622 So.2d 716 (La.App. 5 Cir.1993). After thoroughly considering the State's evidence in the present case, the juvenile court stated:
"The father has not been able to care for or assist the childhe has been incarcerated in prison since the child was born. The father has never supported the child, seen the child, or given or mailed the child *519 anything. Why has the father not sent the child money or gifts? The Court feels that the father has not [sic] interest in the child. The father has never demonstrated any interest in the child until the State and the Office of Community Services [DSS] decided to proceed with termination proceedings under Louisiana Law. The father has not sent documentation that he acknowledges the child. The father has merely written a letter."
As a reviewing court, it is evident to us that the juvenile court considered whether Devon presented just cause for his failure to take care of and support Q.P. Clearly, it considered Devon's incarceration as a mitigating factor, realized that financial support in this setting should be considered in a different light, but concluded that despite the father's situation, the totality of circumstances indicated that Devon intended to permanently avoid his parental responsibilities and abandoned Q.P. The record is void of any evidence to indicate that Devon contacted Theresa after the birth of Q.P., and that it was not until DSS notified him that there was any attempt by Devon to learn of Q.P. Moreover, even after DSS contacted Devon, there is a period of at least 4 months that Devon had no contact with DSS or anyone else related to this case. Moreover, considering the special medical and physical needs of Q.P. and Devon's inability to meet those needs because of his incarceration, we find that the juvenile court properly considered Devon's limited contacts with DSS as insufficient to countermand its finding of abandonment. Therefore, after reviewing the record as a whole, we cannot say that the juvenile court was manifestly erroneous in its conclusion that the State proved by clear and convincing evidence that Devon abandoned Q.P.
For the foregoing reasons, the judgment of the juvenile court is affirmed.
AFFIRMED.
NOTES
[1] LSA-Ch.C. Art. 1015(6), loss of custody due to parent's incarceration, is not relied upon by the State and is inapplicable to the present case. Simply stated, Q.P. did not come into DSS's custody as the result of the incarceration of his parent in a penal institution. LSA-Ch.C. Art. 1015(6)(b).