|¶MICHAEL E. KIRBY, Judge.
A father, Phillip Humphries, appeals a Judgment rendered by Juvenile Court for the Parish of Orleans terminating his parental rights.

STATEMENT OF FACTS

Prior to their divorce and while he and his former wife were experiencing marital problems, Phillip Humphries, 29, became involved with Raven G., a 16 year old in a marching group coached by his wife. Mr. Humphries’ relationship with Raven resulted in the birth of two children, K.G. on February 12, 1998, and T.G. on January 18, 2000.[1]
Mr. Humphries had no children from his first marriage and wanted to be a family with Raven and his two daughters. In order to support his family, he began to work a second job so that Raven would not have to work and could stay home with the girls.
I ¡As substantiated by the sworn testimony of his two employers Nelda Matula and Dennis “Sonny” Bergeron, Mr. Humphries worked 40 hours per week at a downtown Kwik Kopy as a pressman. He also worked entire weekends (from the end of his regular job on Friday through Sunday night) and several nights per week at Sonny Bergeron’s printing business in Slidell. With this work schedule, he was only home for several hours on two to three nights a week.
In August of 2000, Mr. Humphries’ two children were removed by the State after Children’s Hospital discovered that the couple’s seven month old infant had failure *1037 to thrive syndrome and numerous fractures including a bilateral skull fracture and an old tibia fracture, a humerus fracture and a femur fracture. No signs of past or present abuse were observed on the older girl who was subsequently examined at Children’s Hospital. The Offices of Community Services did not permit Mr. Humphries to see KG. until some four months later when the LSU Infant Team gave its approval.
Both children were placed in the State’s care through the filing of a Petition for Child in Need of Care and the Offices of Community Services (OCS) formulated a case plan for “reunification/adoption.”
Numerous disposition hearings were conducted relative to the Petition for Child in Need of Care, with a Judgment authorizing an 18 month informal adjustment agreement signed on August 30, 2000. Under the terms of this agreement, Mr. Humphries was required to report to the LSU Infant Team for evaluations and one-on-one parenting instruction.
|3In May of 2001, the State decided to abandon the goal of reunification and subsequently filed a Petition to Terminate the Parental Rights of Raven G. and Phillip Humphries in July of 2001. The trial court appointed the Tulane Law Clinic to represent Mr. Humphries.
On the morning of trial, the State amended its petition by deleting the alleged grounds for termination contained in paragraph XI and proceeded to trial against Mr. Humphries based on paragraphs IX and X which read:
IX.
As to any biological father, Phillip Humphries, the Department of Social Services, Office of Community Services represents that his parent’s rights be terminated under L.S.A. — Children’s Code Article 1015, Section (3) and/or (4) and in support thereof alleges:
X.
The Father’s neglect of T.G. was chronic, life threatening and/or resulted in gravely disabling physical or psychological injury or disfigurement, to wit:
1. The Father resided in the same household with the mother Raven G. and children K. and T.
2. The Father failed to notice any of the mistreatment of T. by Raven G., including but not limited to the physical injuries inflicted on the baby, or to T’s emotional reaction to her mother, particularly T’s reactions to being fed by her mother.
3. The Father failed to acknowledge the danger posed by Raven to T. by insisting that T. be returned to their home after Raven had given T. to Amanda Harvey with the knowledge that Raven had expressed an inability to care for T.
Trial was conducted on December 10, 2001, January 9, 2002, and February 14, 2002. On March 5, 2002, the trial court gave oral reasons for terminating the Rparental rights of both Raven G. and Phillip Humphries and issued a written judgment to that effect. Mr. Humphries filed this appeal in an effort to continue being a father in his children’s lives.

STATEMENT OF THE LAW

The appellate court reviews a trial court’s findings as to whether parental rights should be terminated according to the manifest error/clearly wrong standard. State ex rel. J.W., 2001-0500 (La.App. 4 Cir. 11/14/01), 801 So.2d 1182, 2285.
On March 5, 2002, the trial court terminated Mr. Humphries’ parental rights stating that the “failing [of Mr. Humphries] to take steps to know what was going on with the children is tantamount to aiding and abetting in the behavior engaged in by the mother. And so it’s based on 1015(3) (i) as *1038 well.” (The trial court had first terminated the mother’s rights under 1015(3)(i) for her admitted physical abuse of her youngest child.)
Title X of the Louisiana Children’s Code governs the involuntary termination of parental rights and sets forth seven grounds for such a termination. The trial court based its ruling herein on one of the grounds alleged in the State’s amended petition, La. Ch.Code article 1015(3)(i) which provides as cause for termination:
(3) Misconduct of the parent toward this child ... which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission aiding or abetting, attempting, conspiring or soliciting to commit any of the following:
[[Image here]]
(1) Abuse or neglect which is chronic, life threatening, or results in gravely disabling physical or psychological injury or disfigurement.
| BThe La. Ch.Code article 1003(10) defines neglect as:
[T]he refusal or failure of a parent or caretaker to supply the child with the necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child’s physical, mental, or emotional health and safety is [sic] substantially threatened or impaired.
The La. Ch.Code article 1003(1) defines abuse as:
[A]ny of the following acts which seriously endanger the physical, mental, or emotional health and safety of the child:
(a)The infliction or attempted infliction, or, as a result of inadequate supervision, the allowance or toleration of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person.
(b) The exploitation or overwork of a child by a parent or any other person.
(c) The involvement of the child in any sexual act with a parent or any other person, or the aiding or toleration by the parent or the caretaker of the child’s sexual involvement with any other person or of the child’s involvement in pornographic displays, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.
There was absolutely no evidence presented at trial that Mr. Humphries ever abused either of his two children and in fact, no allegation of abuse was ever made against him. The trial court specifically affirmed this fact, saying, “I do not believe that Mr. Humphries hit or touched the child’s limbs. I am not saying that....”
In addition there is no evidence in the record that Mr. Humphries refused or failed to supply the children with necessary food, clothing, or shelter. Mr. Hum-phries’ parental rights were terminated because- he relied on the mother of his two children to properly care for their youngest child, while he was away from home working two jobs in order to support his family.
IfiThe trial court acknowledged Mr. Humphries’ efforts to support his children and their mother, commenting:
In our culture we value men who work to provide for their families a home, food, clothing, and shelter. We value that. A concern for me in this case is that seems to have been minimized, because Mr. Humphries worked and wasn’t available somehow that equates to not being a good father. He’s to be applauded, I believe, for that effort. And at a time when he understood I *1039 guess that there was a problem, and he needed to do something different, he made a sacrifice and he quit one of the jobs. Again, something that I think is a positive.
Nevertheless, the trial court held Mr. Humphries accountable for his not knowing that his youngest child was being abused because,
... try as I may I cannot come to grips with how he did not know, how he could not see, how he could not hear the pain of T. as she lay with swollen skull because her mother had hit her head into the wall, as he[sic] lay with broken arms, legs and he said, he changed the diaper. He said he played with her when he came home from work. I believe that the child would have been in so much pain he would have had to know. He should have known. And as much as I would like to do something different, I cannot believe that he did not no[sic], or he should have known.
No evidence was ever presented at trial to support a finding that Mr. Humphries ever had the opportunity to observe his daughter’s head the night Raven swung the child against the wall. Raven testified that when Mr. Humphries came home from work that night sometime between midnight and two in the morning, the child’s head was not swollen and that she fed the baby that morning before she took her to Amanda Harvey so that Mr. Hum-phries would not see the child. Given the fact the time(s) when the older injuries occurred was/were not determinable, there is no way to know their proximity to the times when Mr. Humphries played with, fed or changed the child.
|7The testimony of Dr. Scott Benton, a forensic pediatrician, did much to explain the severe pain the seven month old, T.G., endured at the hands of her mother. Nevertheless, Dr. Benton could not say with certainty that the father, Mr. Humphries, should have known of these injuries. When questioned about what a parent might have observed about T.G., he responded in terms of what might have been noticed by the “astute individual” or “if you’re observant enough” and not what a tired dad, who worked two jobs and was only home for limited periods of time during the child’s first seven months of life would be expected to detect.
The Mary Buck Clinic had occasion to examine T.G. on several occasions in the year 2000. But as concerns the physical abuse that T.G. suffered, the records at the Mary Buck Clinic did not make note of any of this, until around August of 2000— when the baby was removed from the household of Raven and Mr. Humphries. As of the May 4, 2000 visit, the Clinic notes reflect that T.G. was “doing well.” The Mary Buck Clinic noted that T.G. weighed less than average and informed the mother about this fact. Nevertheless, the fact that the Mary Buck Clinic did not find signs of physical abuse in February, May and June of 2000, seems to us to exculpate Mr. Humphries. If trained professionals did not detect such health problems, it strains credulity to suggest a lay person could be expected to do so.
There is only speculation in the record as to when Raven injured T.G. The record contains no clear and convincing evidence to support a finding that he knew or should have known of the plight of his daughter. To the contrary, K.G., T.G.’s elder sister, had not been physically abused and was doing well. The record does not reveal that Mr. Humphries had any reason to believe that T.G. was being treated any differently than K.G. by her mother.
| sRaven G., the mother of the two children, testified that she had never abused her eldest child and that she never abused her youngest child in front of Mr. Hum- *1040 phries or ever told him of any abuse that she inflicted on T.G. because if he knew, their relationship would end and he would make her leave. She also stated that she never lost her temper with the infant around Mr. Humphries and that she hid her stress and conflict over the youngest child’s paternity from him. Additionally, she testified that after she was released from jail, he asked her how she could have done the things she did and he asked her to leave his home.
Because of Raven G.’s testimony of concealing her actions from the father of the children, it was legal error to terminate the father’s parental rights. Mr. Hum-phries cannot be held liable for “aiding and abetting” as defined in 1015(3)(i) when knowledge of the abusive mother’s actions were concealed from him. Moreover, when trained professionals at the Mary Buck Clinic did not detect the abuse, it strains credulity to suggest that the father should be held liable for not discovering the abuse. The father committed no act that justifies the state depriving him of his parental rights.
Ms. Sharon Garcarz Davies, a clinical social worker and an infant mental health specialist, was the treating therapist for this family. She testified that due to passivity, Mr. Humphries was not a good father. Nevertheless, her records reveal that she was not actively treating or providing Mr. Humphries with one-on-one parenting training in order for him to become a better father. Mr. Humphries was questioned extensively and analysed, but he received no pro-active instruction or reading material about the needs of his children. This fact becomes more noteworthy, given that Ms. Garcarz Davies gave special instruction and reading materials to Ms. Harvey, with whom T.G. has been placed. Ms. Harvey also ^received other suggestions and feedback on the needs of Mr. Humphries’ daughters.
The testimony of Ms. Sharon Garcarz Davies was soundly impeached by numerous statements of Mr. Humphries contained on the Infant Team’s videotapes:
Sometimes angry with myself, I didn’t observe things I should have.... [That’s] Why I stopped working 2 jobs.... I should have noticed something.
I think now — I didn’t know, a lot more I should have got involved with; go beyond what she weighed, what should she weigh.
[[Image here]]
A lot I didn’t know. A lot of pamphlets and literature if I could have read. If Raven got it, I didn’t.... It was an eye opener, something that will never happen again. If I don’t know something, I’ll ask or ask where to find out.
A lot could have been done; signs so obvious now after the fact.
Injuries happened when I wasn’t there. I put blame on myself — I should have seen things.
... I see a lot more now; working a lot caused me to overlook things I should have seen.
I have learned I have trusted people. But I won’t say what a person can or would do. I look at things differently, a possibility a person you love and care [about] might not tell you — might not be as honest as you thought they were, leaves me a little less trusting.
... I learned to be more observant.
Clearly, these remarks of Mr. Hum-phries during his series of interviews by Ms. Garcarz Davies rebut her conclusion that Mr. Humphries refused to acknowledge that he may have failed to recognize some signs that things were not right between Raven G. and T.
*1041 |inThough expressing reservations about Mr. Humphries’ ability to parent his children, Ms. Garcarz Davies expressed no similar concern about the statements made to her by the oldest daughter’s caregiver during a taped interview in which she remarked that she “yelled and hollered” a lot at the children and “beat the children’s butts.”
The LSU Infant Team members’ remarks about Mr. Humphries’ “passivity” must be weighed by those who operate in the real world against the following practical indicia of non-passivity exhibited by him: working a full time job in downtown New Orleans and a second job in Slidell while not owning a car; complying with everything he was requested to do by the LSU Infant Team and OCS; visiting his children regularly; paying monthly child support in addition to his extra expenditures on the children; and steadfastly fighting to be his children’s father when the easiest course of action would have been to sign a surrender of rights.
Mr. Humphries, as a diabetic working two jobs, may have been tired and worn out during the Infant Team interview sessions wherein they required him to do such things as list 5 adjectives to describe each of his daughter’s personalities during the first 6 months of their lives. Additionally, as the trial judge commented, many parents would interpret what the LSU Infant Team regarded as “passive” behavior by Mr. Humphries during videotaped play sessions with his children as the admirable quality of patience.
Most disturbing about the procedures of the social workers at the LSU Infant Team though, is an internal letter to Ms. Cain dated, August 16, 2001, from Ms. Jean Valliere. Without a scintilla of evidence that Mr. Humphries ever physically abused his children, Ms. Valliere stated, among other ■ things, that T.G. and K.G. L, would not be “safe” in the care of their father. There was certainly evidence to make such a judgment as regards the abusive mother, but there was not, nor has there ever been, reason to make such a prejudicial statement as regards the girls’ father. As is clear from the record, the abusive mother hid her actions from Mr. Humphries, and Mr. Humphries had her leave his household upon discovery of said abuse.
The L.S.U. Infant Team (with whom the Orleans Parish Juvenile Court or O.C.S. contracts) failed to provide Mr. Humphries with any one-on-one parenting instruction. The Infant Team personnel who questioned Mr. Humphries and scrutinized his videotaped play time with his children never provided Mr. Humphries with one videotape, one pamphlet, a reference/reading list or any educational material, even though Mr. Humphries is an intelligent, fully literate man, who is a printer by occupation. When cross-examined about this obvious absence of practical parenting help at trial, the Infant Team members responded that such activity is “not part of didactic therapy.” The trial court frequently expressed frustration with the methodology, or lack thereof, employed by the program at trial.
In contrast to the female personnel of the Infant Team, Errol Lewis[2], M.S.W., conducted group classes sponsored by the LSU Cooperative Extension Service. OCS sent Mr. Humphries to Mr. Lewis’ program. He assessed that Mr. Hum-phries: “... will no doubt do a good job with caring and the nurturing of his children. He possess[sic] many strengths however support systems will contribute *1042 11gto his success with these young girls.” At trial Mr. Lewis described Mr. Hum-phries’ participation in his classes as follows:
“He was very active, Mr. Humphries was always involved in the class and always interested and would always make some reference about how he could benefit with his daughters, that is how I discovered that he had a little girl, well that he had young girls .... he participated, he was very involved.”
Mr. Humphries fully complied with his case plan, despite the many adjustments he had to make at his employment. The State chose not to call Betty Cain, -Mr. Humphries’ case worker, to testify at trial, but the exhibits of Ms. Cain’s case notes, which were introduced at . trial, indicated that, “Mr. Humphries has follow [sic] his case plan and complied with everything asked of him by the agency.”
The effort required for this compliance can only be properly evaluated when one considers exactly what Mr. Humphries actually did. He attended sessions on approximately 20 separate days with the LSU Infant Team between November of 2000 and May 29, 2001. These meetings included lengthy interviews on family history and personal up-bringing; “directed” play sessions (wherein he was told when to give a specific toy to the children and when to take it away) and free play with his children. He completed the eight group classes conducted by Errol Lewis on various childhood and teenage topics. And finally, he underwent a psychiatric exam and a three visit psychological exam and a Saturday meeting with the attorney appointed to represent his children. All of this was accomplished while working a full time job and using time-consuming public transportation since Mr. Humphries does not own a car.
hsGrant Butterbaugh, M.D., testified as to an exhibit in the record, i.e. the last video taped play session of the father with his two daughters, dated April 26, 2001. He found the session to be “emotionally satisfying” as a professional. He stated Mr. Humphries was much more interactive with his children and their needs and was making progress, compared to former sessions. He also testified that Mr. Hum-phries wished to be and was working hard to become a'better father.
Louisiana Courts have continually recognized the fundamental concept that a child has the right to know, and love his parents. In re Billeaud, 600 So.2d 863 (La.App. 3 Cir.1992). In State ex rel. J.M., J.P.M. and M.M., 818 So.2d 802 (LaApp. 3 Cir. 2002), the court expounded on the relationship between parents and their children, writing:
The natural rights between parents and their children are reciprocal and should not be denied except when a parent has proven himself unworthy of his child’s love. In re Adoption of B.G.S., 556 So.2d 545 (La.1990); In re Elliott, 93-750 (LaApp. 3 Cir. 12/8/93), 630 So.2d 281. Parental rights give rise to a fundamental liberty interest and warrant great deference and vigilant protection under the law. State in the Interest of O.P., 94-609 (La.App. 3 Cir. 11/2/94), 649 So.2d 512. Furthermore, because termination of parental rights is in derogation of the natural and fundamental liberties of the parent, proof of the grounds for termination must be proven by at least clear and convincing evidence. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); La. Ch.Code art. 1035. Thus, the termination of parental rights is a severe action which requires an onerous burden of proof. State in the Interest of J.M.L., 540 So.2d 1244 (La.App. 3 Cir. 1989).
*1043 Courts must proceed with care and caution because the permanent termination of the legal relationship existing between parents and children is one of the most drastic actions the state can take against its citizens. Id.
In the Interest of A.D.H., C.A.H., and H.L., 01-107, pp. 4-5 (La.App. 3 Cir. 5/2/01); 784 So.2d 854, 858, writ denied, 01-1509 (La.6/22/01); 794 So.2d 797.
14 One only reaches the issue of what is in the best interest of Mr. Hum-phries’ daughters if there is a determination that he committed one of the acts listed as justification for terminating a father’s right to his children. We find there to be an absence of clear and convincing evidence in the record of any wrongdoing on the part of Mr. Humphries. Given his full compliance with his case plan, we find it was manifestly erroneous for the trial court to follow O.C.S.’s recommendation without the requisite evidence to justify permanent termination of the paternal rights of Mr. Humphries. Moreover, we also find from our review of the record, especially the video tape dated April 26, 2001, of the father with his children, that it is in K.G. and T.G.’s best interest that their father continue to be a part of their lives.
We reverse the trial court’s judgment terminating the parental rights of Mr. Humphries and we remand for further proceedings consistent with the views expressed herein.
REVERSED AND REMANDED.
GORBATY, J. — DISSENTS WITH REASONS.

. It is noteworthy that another man forced Raven to have intercourse prior to T.G.’s birth, and she believed the youngest, T.G., was fathered by this individual and not Mr. Humphries.

. Mr. Lewis has a Master of Social Work and Bachelor of Arts in both psychology and criminal justice.