# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 12-201


**WILLIAM E. PETERS, ET AL.**

**VERSUS**

**ALLEN PARISH SCHOOL BOARD, ET AL.**



**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. C-2005-603
HONORABLE ROBERT BRINKMAN, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## BILLY HOWARD EZELL
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Billy Howard Ezell, Judges.



**AFFIRMED.**



**Walton Joseph Barnes II**
**P. O. Box 66**
**Greenwells Springs, LA 70739**
**(225) 343-4841**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **William E. Peters**
    **Adrian Brown**

**Robert Lloyd Hammonds**
**P. O. Box 65236**
**Baton Rouge, LA 70896**
**(225) 923-3462**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Allen Parish School Board**
    **Linda Thompson**
    **Louisiana Risk Management Agency**

**Neal Lane Johnson, Jr.**
**Hammonds & Sills**
**1881 Hudson Circle**
**Monroe, LA 71201**
**(318) 324-0101**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Allen Parish School Board**
    **Linda Thompson**
    **Louisiana Risk Management Agency**

**EZELL, Judge.**

This case involves a suit against the Allen Parish School Board, the principal of Oakdale Middle School, and the insurance company. We must determine whether the School Board and its principal breached its duty in releasing two minor children to their mother. Mr. William Peters, who had been caring for the children, argues that their actions in releasing the children caused damage to him and the children. The trial court found in favor of the School Board. The Plaintiffs then appealed.

## FACTS

Crystal Cheney lived off and on with William Peters for about four years in Oakdale. She had two children, Adrian and Jacob Brown, from a previous relationship. Mr. Peters has known Jacob since he was two-and-a-half years old and Adrian since she was three to four years old. Mr. Peters testified that he did everything a father would for the children.

Around 2000, Ms. Cheney left her children with Mr. Peters. She moved to Lafayette and got married. Mr. Peters moved to Georgia to go to school to study dental lab technology. On August 2, 2001, Ms. Cheney signed a "Provisional Custody by Mandate" granting provisional custody of both minor children to Mr. Peters. The children moved with Mr. Peters to Georgia until he finished school, at which time he moved back to Oakdale.

On December 13, 2004, the children were attending Oakdale Middle School. Ms. Cheney, along with her father and brother, went to the school that morning. Ms. Cheney indicated that she was withdrawing the children from school and they were going to Texas. Ms. Cheney showed a copy of the provisional custody mandate to Linda Thompson, the principal of Oakdale Middle School at the time. There was also a copy in the children's school file. The provisional custody by mandate signed on August 2, 2001, stated, "This provisional custody by mandate shall be effective until

revoked in writing by the appearer or one year from date hereof, whichever period is shorter." Ms. Cheney also had copies of the children's birth certificates indicating she was their natural mother. Additionally, Ms. Thompson asked to see the mother's driver's license. Upon reviewing the children's records, Ms. Thompson observed a remark in the children's records stating, "ALARM WILLIAM PETERS HAS CUSTODY".

At that point, Ms. Thompson called the Oakdale Police who came to the school. Ms. Thompson asked Lieutenant Bruce Hudgens, who responded to the call, for advice on the custody paperwork. He suggested she call the district attorney. Ms. Thompson then called the district attorney's office and talked with Todd Nesom, an assistant district attorney at the time. The officers brought the paperwork to him to review. Mr. Nesom explained to Ms. Thompson that the provisional custody by mandate was valid for only one year or it could be revoked at any time. He suggested that, out of an abundance of caution, Ms. Cheney should expressly revoke the provisional custody by mandate. Mr. Nesom also advised Ms. Thompson that Ms. Cheney had legal custody as the mother.

Ms. Cheney revoked the provisional custody by mandate in writing. Rachelle Ardoin, the school counselor at Oakdale Middle School, helped Ms. Thompson handle the withdrawal request by Ms. Cheney. The proper forms for withdrawal were filled out.

The children were then brought to the office. Ms. Cheney left the school with the children along with her father and brother. A couple of witnesses testified they saw the children leaving with Ms. Cheney and her family. They observed that Adrian was screaming and kicking to get away as they neared the vehicle. The children were pushed into the vehicle and drove away. The witnesses indicated that they saw Ms.

2

Thompson outside as the children were leaving. Ms. Thompson testified that she did not leave the building, which Ms. Ardoin also confirmed.

The group then proceeded to Lake Charles where Ms. Cheney got out. Ms. Cheney' brother was then dropped off in Tyler, Texas. The children then rode to Athens, Texas with their grandfather to his house. The children were at their grandfather's house for about five weeks when they were removed by child protection services. Subsequently, the children were in and out of foster homes for several years. Adrian was in a juvenile detention center for some time.

Mr. Peters testified that he was out of town that day when he received a call from Ms. Thompson requesting updated custody papers because the children's mother was there. He testified that he rushed back but the kids had already gone. Ms. Thompson denied that she called Mr. Peters. Ms. Ardoin testified that they did not attempt to call Mr. Peters because they were trying to find out if Ms. Cheney was legally entitled to the children and calling Mr. Peters would have created drama.

Mr. Peters immediately hired an attorney to start custody proceedings. A judgment was signed on January 21, 2005, granting Mr. Peters the sole custody of the children. Mr. Peters filed an affidavit seeking return of the children.

Crystal's father then filed false criminal charges against Mr. Peters claiming that he had sexually abused the children. Mr. Peters then hired another attorney to defend against the criminal charges. Both children eventually recanted the allegations, and the charges were dropped.

Adrian eventually ran away and found her way back to Oakdale and enrolled in the high school. Jacob did not make it back until a week before the trial but was living with Mr. Peters at that time.

Mr. Peters filed suit individually and on behalf of the minor children. When Adrian reached the age of majority, she was substituted as a plaintiff in her own right.

3

Mr. Peters alleged that he and the children were damaged because Ms. Thompson wrongfully released the children to their natural mother without due regard for their wishes and well-being. As a result, Mr. Peters argues that he and the children suffered years of pain and anguish.

Trial on the matter was held on October 26, 27, and 28, 2011. Closing arguments were submitted to the court on November 7, 2011, at which time the court ruled. The trial court found that Ms. Thompson did everything she could under the circumstances. It further found that Ms. Thompson exercised reasonable care in releasing the children to their mother and that there was no violation of any duty owed to Mr. Peters and the children. Judgment dismissing the claims against the Allen Parish School Board and Ms. Thompson was signed on December 19, 2011.

## DISCUSSION

### Duty

In *S.J. v. Lafayette Parish School Bd.*, 09-2195 (La. 7/6/10), 41 So.3d 1119, the supreme court reiterated that the duty-risk analysis applies in determining whether liability exists under the facts of a case against a school board. The supreme court explained that the first task is to determine what duty, if any, the school board owed to the Plaintiffs.

This case was previously before this court on the trial court's grant of a peremptory exception of no cause of action dismissing Mr. Peter's claims. *Peters v. Allen Parish Sch. Bd.*, 08-323 (La.App. 3 Cir. 11/5/08), 996 So.2d 1230. This court recognized that a school's duty of supervision includes "'the duty to make the appropriate supervisory decisions concerning a student's departure from campus during regular school hours'". *Id.* at 1234 (quoting *D.C. v. St. Landry Parish Sch. Bd.*, 00-1304, p. 5 (La.App. 3 Cir. 3/7/01), 802 So.2d 19, 23, *writ denied*, 01-981 (La. 5/25/01), 793 So.2d 169). "Affording Mr. Peters' petitions every reasonable

4

interpretation in favor of maintaining their sufficiency", this court then concluded that he had stated a cause of action. *Id.* Therefore, we must review the evidence presented and decide whether Ms. Thompson made an appropriate supervisory decision regarding the departure of Adrian and Jacob with their mother, grandfather, and uncle.

## Breach of Duty

The manifest error/clearly wrong standard of review applies to our determination of whether Ms. Thompson's conduct breached the duty of care when she allowed the children to leave with their mother. *S.J.*, 41 So.3d 1119. In applying this standard, we are mindful that "the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's (sic) conclusion was a reasonable one." *Id.* at 1127. "If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.*

Pursuant to La.R.S. 9:951, a parent can "authorize any person of legal age to provide for the care, custody, and control of a minor child." "The mandate of provisional custody shall be effective for the duration of time provided therein, but in no case shall it exceed one year from date of execution." La.R.S. 9:952(A).

Mr. Peters has argued that his history with the children, the fact the birth certificates had been certified only days before, and the check-out procedures should have put the school on notice that something was amiss. The Allen Parish School Board policy states the following regarding student dismissal:

> No staff member shall excuse any pupil from school prior to the end of the school day, or into any person's custody, without the direct prior approval and knowledge of the principal.
> The principal shall not excuse a pupil before the end of the school day without a request for the early dismissal by the student's parent/guardian. Telephone requests for early dismissal of a pupil shall

5

be honored only if the caller can be positively identified as the pupil's parent or guardian.

Also, the Allen Parish School Board is aware that because of legal separation and divorce, many children enrolled in the public schools live with a parent having legal custody, with the other parent being legally non-custodial. The Board is also aware that problems may arise when a non-custodial parent attempts to pick up a child at school. Consequently, it shall be the responsibility of the parent with legal custody, who does not wish the non-custodial parent to pick the child up from school, to provide the principal of the school with a certified copy of the judgment of the court granting custody, and with a written request not to permit the non-custodial parent to pick the child up from school.

The School Board's policy further provides that, "During school hours, or while engaging in school-sponsored activities, students shall be released only into the custody of parents or other authorized persons."

The Oakdale Middle School handbook also provides specific policies concerning check-in and check-out procedures. Ms. Thompson, who implemented the check-in/check-out procedures, explained that it was to prevent absenteeism and tardiness.

First, as explained by Ms. Thompson, Ms. Cheney was withdrawing the children from the school and not checking them out. Secondly, while the check-out procedures indicated that only those individuals with legitimate signatures may check the children out, the policy also indicates that a parent/guardian should wait in the office to receive their child and then sign them out. The signature section obviously allows the parent or guardian to list other people, like other family members, who are permitted to pick up the children.

In the present case, Ms. Thompson was presented with a situation in which the biological mother, who had legal custody and whose rights to the children had never been terminated, came to school asking to withdraw her children. The provisional custody by mandate that was on file had expired on August 2, 2002, almost two-and-one-half years before the mother withdrew the children from the school.

Unfortunately, Mr. Peters never sought to extend the provisional custody by mandate nor did he seek permanent custody of the children until after this incident. Therefore, Mr. Peters no longer had the care, custody, and control of the minor children.

The fact of the matter is that Ms. Cheney was the children's mother with the full legal rights of a parent. "Parental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *State in the Interest of B.K.N.*, 11-1095, p. 3 (La.App. 3 Cir. 12/7/11), 82 So.3d 391, 393 (quoting *State ex. Rel. O.P.*, 94-609, p. 3 (La.App. 3 Cir. 11/2/94), 649 So.2d 512, 515). Under the law, she was legally the only one who could make decisions. Mr. Peters has not offered any evidence that Ms. Cheney did not have legal authority over her children when she withdrew them from school. It was only after this incident that Mr. Peters took the necessary steps to ensure his authority to provide for the care, custody, and control of the children. The school is not an administrator of custody issues and can only make decisions based on the information it has.

Ms. Thompson clearly made a painstaking effort to ensure that the school should release the children to Ms. Cheney. She called the police and the district attorney's office. It was not until she was advised that Ms. Cheney had the legal rights to the children, that she released them. Testimony revealed that the process from the time Ms. Cheney arrived until she left with the children took about three hours. Ms. Thompson approached this situation with much thought and deliberation. It was not a decision that was made lightly.

Unfortunately for the children, it is their mother that apparently did not exhibit care and concern for their well-being. It was her decision that took these children away from Mr. Peters who was providing a wholesome and loving environment. It

7

was her decision to send them with her father to Texas, resulting in their placement in foster care for the next several years.

We find that the trial court properly considered the evidence and testimony before it and concluded that Ms. Thompson made an appropriate decision in allowing Adrian and Jacob to leave with their mother. Therefore, we find no manifest error in the trial court's judgment. All costs of this appeal are assessed to William Peters and Adrian Brown.

**AFFIRMED.**